In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2999

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MAGIN E. VILLASENOR,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03-CR-689—**Joan B. Gottschall**, *Judge*.

ARGUED SEPTEMBER 19, 2011—DECIDED DECEMBER 23, 2011

Before EASTERBROOK, *Chief Judge*, and KANNE and
WILLIAMS, *Circuit Judges*.

KANNE, *Circuit Judge*. Magin Villasenor, along with
sixteen other defendants, was charged with various crimes
arising out of a conspiracy to distribute cocaine and
marijuana across several states. A jury found Magin guilty
of sixteen out of the nineteen charged counts. He
now raises a number of issues on appeal, including chal-
lenges to the sufficiency of evidence presented at trial,

the decision to admit a co-conspirator's statements into evidence, and the district court's refusal to grant a motion for a new trial following the discovery that the government suppressed evidence favorable to the defense. We find none of these contentions meritorious, and accordingly affirm his conviction.

## I. BACKGROUND

A plan to distribute cocaine first began in 1995 when Marco Villasenor, Magin's brother, met Stevie Jones while locked up in a Missouri jail. There, the two discussed the possibility of dealing drugs together at some point in the future. They made good on these plans following their release, when Marco met Jones in Texas in order to supply him with cocaine and marijuana. Later, Marco introduced Jones to his brother, Magin, and the two also discussed the possibility of conducting cocaine deals together.

These plans came to fruition in 1996, when Jones began obtaining cocaine from Magin. The deals initially involved quantities ranging from nine to eighteen ounces, but Jones requested greater amounts of cocaine as time went on and the conspiracy expanded in size and scope. By 2003, Jones obtained two to four kilograms of cocaine at a time from Magin, once or twice per month.

Numerous other individuals were also involved in the cocaine distribution scheme, most of whom need not be discussed for purposes of this appeal. One of the relevant individuals, however, was Jones's girlfriend,

Princess Coleman. Coleman assisted Jones by transporting cocaine and money between Michigan and Texas. Jones also introduced Magin to Robert Rider; together, Jones and Rider would pool their money to buy cocaine from Magin in Chicago and Texas, and then resell the drugs.

At trial, the government introduced evidence of several specific drug transactions. The first transaction took place on January 10, 2003. Rider drove from Michigan to a hotel in Willowbrook, Illinois, planning to buy two kilograms of cocaine from Magin and to repay him $5,000 for a debt owed by Jones. After exchanging $45,000 for the two kilograms of cocaine, Rider drove back to Michigan. Unbeknownst to him, Federal Bureau of Investigation agents were conducting surveillance outside the hotel and followed the car as it left. In Michigan, state police officers stopped the car. Although Rider attempted to flee during a high-speed chase, police eventually apprehended him. Police recovered two kilograms of cocaine from the trunk of his car, and matched a latent fingerprint on the cocaine packaging to Magin.

Another transaction occurred on January 24, 2003, when Jones and Coleman drove from Michigan to Chicago in order to purchase cocaine from Magin and to repay another debt owed by Jones. The two picked up two kilograms of cocaine from Magin's apartment in exchange for $40,000. An FBI agent followed them leaving Magin's residence; the agent photographed the vehicle, but did not attempt to stop the car.

The next transaction discussed at trial occurred on February 12, 2003, when Jones purchased a bus ticket from

Atlanta to Chicago, planning to buy cocaine from Magin later that same day. Jones arranged for Coleman to bring $80,000 from Michigan to the bus station in Chicago, and used this money to buy four kilograms of cocaine from Magin. FBI agents, surveilling Jones for much of the evening, planned to pose as dirty cops and "rip" the cocaine from him before he left Chicago. As Jones was walking back to the bus station, the agents stopped him and seized the four kilograms of cocaine, letting Jones go afterwards.

Frustrated that his cocaine had been taken by "dirty" cops, Jones again arranged to buy cocaine from Magin on March 21, 2003. But intercepted telephone calls revealed that this time Jones planned to have Coleman take the cocaine from Magin without paying for it, in order to make up for the stolen cocaine. Magin met with Coleman in a hotel room in Chicago and gave her a bag containing three kilograms of cocaine. He waited for her to return with money, but she instead fled with the drugs. After the deal went awry, Magin called one of his co-conspirators and reported, "they robbed me dude."

On July 23, 2003, after conducting months of surveillance on the individuals involved in the drug-distribution scheme, FBI agents executed a search warrant at Magin's residence in Chicago. Magin lived with his family in a two-bedroom upstairs apartment in a two-story building. Magin and his family were not present while agents searched the apartment; instead, they had been staying in Texas for about a week before the search was conducted. During the search, agents

found a loaded handgun and an extra magazine underneath the mattress in the master bedroom. In the dining room were pay stubs, tax documents, and a checkbook for an account belonging to Magin and his wife. Magin was later arrested and charged with conspiracy to distribute controlled substances, 21 U.S.C. § 846; distributing a controlled substance, 21 U.S.C. § 841(a)(1); using a communication facility in committing a felony narcotics offense, 21 U.S.C. § 843(b); and illegally possessing a firearm, 18 U.S.C. § 922(g)(1).

At trial, statements made by another one of Magin's brothers, Carlos Villasenor, were admitted into evidence as co-conspirator statements. Carlos's involvement in the conspiracy appears to have begun in 2001, when he introduced Magin to Gabriel Maldonado. Magin and Maldonado conducted several transactions together involving multiple kilograms of cocaine in both San Antonio and Chicago. Carlos's role was to dictate the price of the cocaine that Maldonado supplied to Magin, in exchange for a fee. In one of these transactions, Maldonado "fronted" Magin ten kilograms of cocaine. Carlos vouched for Magin, assuring Maldonado that Magin would pay for the drugs after their delivery in Chicago.

Carlos also spent time moonlighting as an informant for the Drug Enforcement Agency, using the DEA to investigate, and thus eliminate, his rival drug dealers. Carlos's cooperation with the DEA began as early as 1985, and continued intermittently through 2000. On April 23, 2003, FBI agents investigating Carlos's involvement in

the charged conspiracy intercepted a conversation between a DEA agent and Carlos. During the conversation, Carlos asked the agent whether he was interested in Carlos's assistance in investigating Wilfredo Rodriguez, a rival drug dealer. The agent indicated that he was, and after a lull of three years, Carlos was once again assisting the DEA. Later, FBI agents contacted the DEA and informed them of the FBI's ongoing investigation of Carlos and his involvement in the charged conspiracy to distribute cocaine.

The DEA decided to go forward with a plan to use Carlos to investigate Rodriguez, despite the FBI's separate investigation of Carlos's own activities. Carlos never proffered any information related to the charged conspiracy to distribute cocaine; in fact, he was unaware of the FBI's investigation and sought to keep evidence of his continued involvement in the drug-distribution scheme from the DEA agents with whom he was working. The investigation of Rodriguez, and Carlos's assistance to the DEA, ended with Rodriguez's arrest in New Jersey on June 6, 2003. Thus, Carlos assisted the DEA for a total of approximately one and one-half months in 2003. All of Carlos's statements admitted into evidence during Magin's trial occurred in 2003, but either before or after the one and one-half-months that Carlos assisted the DEA.

At trial, the evidence presented against Magin included intercepted telephone conversations, surveillance photographs, and testimony from cooperating witnesses. The evidence also included physical evidence recovered from the bedroom of a co-defendant, Joaquin Mendez, consisting of a firearm, a drug ledger, and a digital scale.

A chemist for the DEA, Anthony Harris, testified that he tested the scale and found that it contained trace amounts of cocaine. On March 3, 2006, the jury found Magin guilty of sixteen counts charged in the indictment. The jury found Magin not guilty of three counts: two counts relating to the distribution of cocaine arising out of the transaction on January 24, 2003, and one count relating to the use of a telephone to facilitate the conspiracy arising out of the transaction on March 21, 2003.

In April 2007, over a year after the jury rendered its verdict, prosecutors learned that at the time of Magin's trial Harris had been under investigation by the DEA for inattention to duty. The undisclosed evidence revealed that Harris generally failed to follow laboratory procedures and improperly recorded information in the cases he was assigned. In total, Harris incorrectly labeled twenty-three exhibits throughout his tenure at the DEA, including the digital scale that he examined for Magin's trial.[1] He would later receive a two-day suspension for this conduct. On April 17, 2007, the government disclosed that Harris had been under investigation at the time of Magin's trial. On June 30, 2008, Magin filed a motion for a new trial on the basis of this newly discovered evidence.

On March 21, 2009, the district court denied Magin's motion for a new trial. The court found that the evidence had been wrongfully suppressed, though through no bad

---

[1] The digital scale was incorrectly labeled as Exhibit 1 instead of Exhibit 3.

faith conduct on the part of the prosecutors. The suppressed information was also favorable to Magin because it could have been used to impeach Harris at trial. However, the court noted that the government subsequently had the scale retested and the results of Harris's tests were confirmed. Moreover, the court found that the remainder of the evidence against Magin was overwhelming, and thus the undisclosed information did not undermine the results of the trial. On this basis, Magin's motion was denied.

## II. ANALYSIS

Magin presents a number of arguments for review. First, Magin claims that there was insufficient evidence for the jury to conclude that he was involved in a conspiracy, rather than merely a part of multiple buyer-seller relationships. Magin also argues that there was insufficient evidence to establish that he constructively possessed the gun found in his Chicago apartment because he was in Texas while the FBI conducted its search. Next, Magin claims the district court abused its discretion by admitting Carlos's statements as co-conspirator admissions because Carlos had been a government informant. Finally, Magin challenges the district court's denial of his motion for a new trial because the government suppressed favorable evidence that could have been used to impeach Harris's testimony. We take each of these arguments in turn.

*A.  Challenges to the Sufficiency of the Evidence*

Magin challenges the sufficiency of the evidence underlying his convictions for conspiracy and gun possession. The standard of review for sufficiency of the evidence challenges is a "nearly insurmountable hurdle." *United States v. Taylor*, 637 F.3d 812, 815 (7th Cir. 2011). "[W]e view all the evidence and draw all reasonable inferences in the light most favorable to the government." *United States v. Wright*, 651 F.3d 764, 770 (7th Cir. 2011) (internal quotation marks and punctuation omitted). A conviction will be overturned only where the record is "devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Durham*, 645 F.3d 883, 892 (7th Cir. 2011).

*1.  Conspiracy to Distribute Cocaine*

Magin contends that the evidence presented at trial demonstrated a mere buyer-seller relationship among the co-defendants, rather than a conspiracy to distribute cocaine. Magin acknowledges evidence of sales and purchases of cocaine among himself, Jones and Rider. However, he argues that without evidence of an agreement to distribute cocaine, separate and distinct from the sales themselves, there was insufficient evidence to establish a conspiracy. Even if he knew that they intended to resell the cocaine, Magin concludes, this knowledge did not make Magin's sales part of a conspiracy because he did not share in profits from subsequent sales.

A drug-distribution conspiracy under 21 U.S.C. § 846 requires evidence "that the defendant knowingly agreed—either implicitly or explicitly—with someone else to distribute drugs." *United States v. Johnson*, 592 F.3d 749, 754 (7th Cir. 2010). But when the alleged co-conspirators are in a buyer-seller relationship, "we have cautioned against conflating the underlying buy-sell agreement with the drug-distribution agreement that is alleged to form the basis of the charged conspiracy." *Id.* Thus, "to prove a conspiracy, the government must offer evidence establishing an agreement to distribute drugs that is distinct from evidence of the agreement to complete the underlying drug deals." *United States v. Vallar*, 635 F.3d 271, 286 (7th Cir. 2011) (internal quotation marks omitted).

"Certain characteristics inherent in any ongoing buyer-seller relationship will also generally suggest the existence of a conspiracy," and thus offer the jury no basis to distinguish the alleged conspiracy from the underlying buyer-seller relationship. *Johnson*, 592 F.3d at 754. These inherent characteristics include "sales of large quantities of drugs, repeated and/or standardized transactions, and a prolonged relationship between the parties." *Id*. Instead, a conspiracy may be distinguished from a nonconspiratorial buyer-seller relationship through other evidence, including sales on credit, an agreement to look for customers, commission payments, evidence that one party provided advice for the other's business, or an agreement to warn of future threats to each other's business from competitors or law enforcement. *Vallar*, 635 F.3d at 287.

Importantly, "not all credit sales can support an infer-
ence that there was an agreement to distribute." *Id.* (inter-
nal quotation marks omitted). For example, evidence
that a supplier extends credit to an individual purchas-
ing small quantities of drugs for personal consumption
would not suffice to establish a conspiracy. *Id.* But when
a credit sale is combined "with certain characteristics
inherent in an ongoing wholesale buyer-seller relation-
ship—i.e., large quantities of drugs, repeat purchases
or some other enduring arrangement—the credit sale
becomes sufficient evidence to distinguish a conspiracy
from a nonconspiratorial buyer-seller relationship."
*Id.* Thus, once the government has offered some distin-
guishing evidence, such as credit sales, the jury may
then rely on other evidence, such as the involvement of
large quantities of drugs, to "buttress an inference
that there was an agreement to distribute drugs." *Johnson*,
592 F.3d at 758.

There was ample evidence to distinguish Magin's
relationship with his co-defendants as a drug conspiracy,
rather than a mere buyer-seller relationship. Magin fronted
large quantities of cocaine to Jones, and he was also fronted
cocaine by other members of the drug-distribution
scheme. The evidence presented at trial included testi-
mony from Jones and Rider detailing various instances
when Magin fronted cocaine to Jones, in addition
to intercepted telephone calls corroborating their testi-
mony. The fronting of large quantities of drugs, combined
with evidence of repeated transactions and a prolonged
relationship between the purported members of
the conspiracy, supports an inference that there was

an agreement to distribute cocaine, distinct from any underlying buy-sell relationship. We therefore find the evidence sufficient to support the jury's verdict.

*2. Gun Possession*

Magin also challenges the sufficiency of the evidence supporting the jury's verdict that he was a felon in illegal possession of a firearm for purposes of 18 U.S.C. § 922(g)(1). A conviction on this count requires the government to prove that Magin was "(1) a felon, (2) who had possessed a firearm, (3) that had traveled in interstate commerce." *United States v. Harris*, 587 F.3d 861, 866 (7th Cir. 2009). Magin claims that the evidence was insufficient to establish the element of possession because he was in Texas when FBI agents searched his Chicago apartment and discovered a handgun. Moreover, he contends that an "unknown third party" let FBI agents into his Chicago apartment. An FBI agent testified that he entered the apartment after having been provided with a key by an older woman present in the lower level of the building. Magin argues that the gun could have been placed underneath his mattress by this person because she had access to the apartment.

To satisfy the possession requirement in 18 U.S.C. § 922(g)(1), the government may prove either actual or constructive possession. *United States v. Morris*, 576 F.3d 661, 666 (7th Cir. 2009). "Constructive possession is a legal fiction whereby an individual is deemed to 'possess' contraband items even when he does not *actually* have immediate, physical control of the objects." *Id.*

(emphasis in original). Constructive possession is present "when a person knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly, or through others." *United States v. Caldwell*, 423 F.3d 754, 758 (7th Cir. 2005). In order to distinguish true possessors from mere bystanders, the government must establish a nexus between a defendant and the relevant item. *Morris*, 576 F.3d at 666.

Although Magin posits that he was unable to constructively possess the firearm because he was in Texas, his location at the time of the search is immaterial. *See, e.g.*, *United States v. Kitchen*, 57 F.3d 516, 521 (7th Cir. 1995) (defendant constructively possessed firearms in his residence despite being incarcerated while search warrant was executed). A nexus between a defendant and a firearm for purposes of constructive possession can be established by showing that the firearm was seized from the defendant's residence. *Caldwell*, 423 F.3d at 758. The facts in the record were sufficient for the jury to infer that Magin resided in the Chicago apartment. The evidence establishing his residence included pay stubs, tax documents, and a checking account book, all bearing his name, found in the apartment. Moreover, intercepted telephone calls indicated that he was traveling to Texas merely to carry out a drug deal. The evidence was sufficient to establish that Magin resided in the apartment, and therefore, constructively possessed the firearm.

Neither does Magin's assertion that an older woman had access to his apartment render the evidence insufficient to

support the verdict. Constructive possession may be sole or joint. *United States v. Hampton*, 585 F.3d 1033, 1041 (7th Cir. 2009). The fact that a third party may have had access to the apartment, and therefore the firearm, does not negate the inference that Magin had access to the firearm as well. *Kitchen*, 57 F.3d at 521. Moreover, the jury was within its rights to conclude that the firearm was under the exclusive control of Magin, a large-scale drug dealer, rather than equate speculation with reasonable doubt and indulge in the unsupported inference that this "unknown" older woman ever even came into the apartment, let alone hid a firearm underneath Magin's mattress. There was no evidence in the record to support this latter scenario, but an abundance of evidence to support the former. The evidence was sufficient to support the jury's verdict.

## B.  Co-Conspirator Statements

Magin next challenges the district court's decision to admit statements made by his brother, Carlos, during intercepted telephone conversations as co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E). We review the district court's decision to admit non-hearsay co-conspirator statements for an abuse of discretion. *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010). A statement made by a member of a conspiracy is admissible pursuant to Rule 801(d)(2)(E) if the government proves by a preponderance of the evidence that a conspiracy existed, the defendant and the declarant were members of the conspiracy, and

the statement was made during and in furtherance of the conspiracy. *Id*. A government informant's statements are not admissible under this rule because he cannot be a conspirator. *United States v. Schalk*, 515 F.3d 768, 775 (7th Cir. 2008).

The district court held that Carlos's statements were admissible, despite his previous status as a DEA informant, because he was acting as a co-conspirator and furthering the goals of the conspiracy when he made the statements. The court found that he was not acting as a government informant because the DEA's investigation was unrelated and Carlos was unaware that the FBI was investigating the charged conspiracy. As the district judge stated, "he had a different hat on" when the statements were made; that of conspirator, rather than informant.

Magin argues that none of Carlos's statements should have been admitted because he was a government informant and therefore could not have acted in furtherance of the conspiracy. According to Magin, it is unimportant that the DEA's investigation was unrelated to the conspiracy at issue, or that the statements were made outside of the one and one-half months that Carlos actively assisted the DEA. Rather, once he became an informant, Carlos no longer shared a common aim with the conspiracy because any information learned during the course of the conspiracy could later be used to cut a deal with the government. As counsel for Magin put it, "Once you become an informant, you're an informant forever."

We reject this argument. Carlos worked with the DEA for various stretches of time prior to 2000, and again during

the DEA's investigation of Rodriguez from April 25, 2003, through June 6, 2003. All of the statements admitted into evidence occurred in 2003 either before April 25 or after June 6, outside the period of Carlos's cooperation with the DEA, and thus were properly admitted. Although there may be cases where it is difficult to discern when an individual ceases to be a government informant, this is not one of them. Carlos had not spoken to the DEA for at least three years prior to his conversation with an agent about Rodriguez, and Carlos's cooperation clearly ended when the DEA arrested Rodriguez. An individual does not become a government informant "forever" by cooperating with the government. *See United States v. Mangual-Garcia*, 505 F.3d 1, 8-9 (1st Cir. 2007) (not plain error for district court to admit co-conspirator's statements under Rule 801(d)(2)(E) because he was a co-conspirator when the statements were made, despite having been a government informant both before and after the statements were made).

Were we to adopt Magin's position, the results would be absurd. Carlos worked as a government informant during the 1980's. According to Magin's argument, this earlier cooperation alone would be sufficient to have prevented Carlos from acting in furtherance of an unrelated conspiracy over a decade later because he could potentially cut a deal with the government using information he learned during the course of the conspiracy. Such an argument ignores the fact that Carlos aided the conspiracy, not because he sought to assist the government, but because he sought to help Magin acquire large quantities of cocaine so that it could then be distributed.

Carlos was a co-conspirator acting in furtherance of the conspiracy both before and after he assisted the DEA. We need not decide whether Carlos's statements could have been admitted if they had been made while he was still assisting the DEA in its unrelated investigation, because that is not the case before us. None of the admitted statements occurred while Carlos was cooperating with the government, and therefore the district court did not abuse its discretion.

## C. *Brady Evidence*

Finally, Magin asks us to review the district court's denial of his motion for a new trial because the government failed to disclose evidence that would have enabled him to impeach Harris, the DEA's chemist, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). We review the district court's denial of the motion for an abuse of discretion, viewing the evidence in the light most favorable to the prevailing party. *United States v. Lewis*, 567 F.3d 322, 328 (7th Cir. 2009).

*Brady* set forth the principle that "the government has the affirmative duty to disclose evidence favorable to a defendant and material either to guilt or punishment." *United States v. Bland*, 517 F.3d 930, 933-34 (7th Cir. 2008). The government's duty to disclose evidence favorable to the defense under *Brady* includes impeachment evidence. *United States v. Wilson*, 481 F.3d 475, 480 (7th Cir. 2007). To win a new trial based on a *Brady* violation, Magin must establish that (1) the prosecution suppressed

evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material to an issue at trial. *Bland*, 517 F.3d at 934. The district court found that the first two elements were met, but held that the evidence suppressed was immaterial.

Suppressed evidence is not material unless there is a "reasonable probability that the suppressed evidence would have produced a different verdict." *Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007). A probability of a different result may be met by "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Bielanski v. Cnty. of Kane*, 550 F.3d 632, 644 (7th Cir. 2008) (*quoting Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).

Magin argues that the evidence is material because Harris's tests found cocaine residue on a digital scale, one of the only pieces of physical evidence admitted at trial. Had the suppressed evidence been available, it could have been used to impeach Harris's testimony and undermine the test results. Magin asserts that this particular jury reviewed the evidence with "a fine-toothed comb" for each count, rather than passively concluding he was guilty, evident by its vote for acquittal on three of the charged counts. Magin maintains that the impeachment evidence would have diminished the overall strength of the prosecution's case and, given how rigorously the jury considered the evidence, there stands a reasonable probability that the jury would have reached a different verdict.

Magin's argument is unpersuasive. Although it is true that the jury may have gone over each piece of evidence with "a fine-toothed comb," the district court concluded that there was overwhelming evidence against Magin irrespective of Harris's testimony. Indeed, the district judge found that "the government's case would have been almost as strong without any chemist's testimony." Agents found drug ledgers and a handgun, in addition to the scale, in the apartment of co-defendant Mendez. The evidence against Magin included taped conversations with other defendants concerning drug transactions, seizures of cocaine in connection with these drug-related conversations, Magin's fingerprints on cocaine packaging, surveillance evidence, and the testimony of several cooperating members of the conspiracy. The district court did not abuse its discretion in concluding that the strength of the remaining evidence rendered the suppressed evidence immaterial.[2] *See United States v. Agurs*, 427 U.S. 97, 109-10 (1976) ("The mere possibility that an item of undisclosed

---

[2] The significance of the suppressed impeachment evidence is itself questionable because the government retested the scale and the presence of cocaine residue was confirmed. Had the impeachment evidence been made available to the defense at trial, the government presumably would have just had another chemist testify as to the presence of cocaine residue. *See United States v. Banks*, 546 F.3d 507, 511 (7th Cir. 2008) ("Perhaps, every time either the Government or a defendant wants a new trial based on a problem with an expert witness, there should first be a hearing to see if an alternate expert might have been produced by the affected side who would have said the same thing as the tainted expert.").

information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.").

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the conviction of Magin E. Villasenor.