**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit
Chicago, Illinois 60604**

Argued May 1, 2013
Decided May 14, 2013

**Before**

WILLIAM J. BAUER, *Circuit Judge*

RICHARD A. POSNER, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 12-3580

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff–Appellee,* | Appeal from the United States District Court for the Southern District of Indiana, Indianapolis Division. |
| *v.* | No. 1:11-cr-155-01-SEB-TAB |
| GARY BAKER, *Defendant–Appellant.* | Sarah Evans Barker, *Judge.* |

**O R D E R**

For more than a year, Gary Baker sold increasingly larger quantities of methamphetamine to a buyer who resold the drugs to members of a motorcycle gang. Baker confessed when confronted by police and agreed to cooperate but then eluded authorities. A jury found him guilty of conspiring to distribute methamphetamine. 21 U.S.C. §§ 846, 841(a)(1). On appeal Baker argues that the evidence of conspiracy is insufficient because, he says, the government proved only a buyer–seller relationship between him and his primary customer. We disagree with that contention, but it is also irrelevant: That customer was not

the only other member of the alleged conspiracy, and Baker does not contest his ties to the others. Because the evidence of a conspiracy is sufficient, we affirm Baker's conviction.

During Baker's three-day trial, the government presented recorded phone calls, Baker's confession, and the testimony of persons who sold, or directly aided Baker's distribution of, methamphetamine. The investigation started when Brian Ellington, who is not one of Baker's codefendants, was arrested in Indianapolis in May 2011 with almost a half-kilogram of methamphetamine. He decided to cooperate with federal investigators. Ellington told FBI agents that he got the drugs from James Taylor, and a week later he made a controlled buy of another pound from Taylor. The government then obtained a court order to monitor Taylor's cellular telephone, and after FBI agents began overhearing him and Baker arranging drug sales in Indianapolis, they obtained a warrant to tap Baker's cellular phone. The government played several phone calls recorded from June through August 2011, in which Baker and Taylor discussed the deals.

Taylor was arrested in August 2011 and testified against Baker after pleading guilty to conspiring with him. He said, and the recorded phone calls corroborate, that initially he was buying methamphetamine from Baker by the ounce but eventually increased the amount to a quarter-pound and then a pound or more per transaction, once or twice a week. The larger transactions followed a pattern: Baker would front the methamphetamine to Taylor, Taylor would sell the drugs to his customers (one of which transactions Baker witnessed), and a week later Taylor would pay Baker. This pattern continued for three months, from May through July 2011.

A second participant who testified against Baker was his son, James Baker, who also pleaded guilty to conspiring with his father. He testified that his father paid him to deliver cars to a man in Michigan. The defendant identified the man only as "Carlos" and did not tell James that he was hiding currency in the cars to pay for the methamphetamine Carlos was supplying. Baker eventually told his son about the money and directed him to wrap it in black carbon paper, which James believed was to avoid x-ray detection. James told the jury that his father never explicitly said the money was for drugs. But James had been living in a house his father owned, and after seeing his father lock money and guns in a safe in that house, James concluded that the money was for drugs. Even so, he continued delivering the currency to Carlos.

Another participant in the conspiracy was Baker's girlfriend. FBI special agent Philip Tejera testified that he had searched a second house that Baker owned, where the girlfriend was living, and in the bathroom found $45,000 in currency from Baker's methamphetamine sales that the girlfriend had hidden.

FBI agents testified that the phone taps yielded information allowing investigators to obtain search warrants for the two houses owned by Baker. At the house where James was living, agents found the safe he described at trial. Inside were guns and ammunition and thousands of dollars in currency. At the other house agents found scales, spoons, and plastic baggies containing traces of methamphetamine. The agents also found Baker.

Agent Tejera interviewed Baker after the search warrant had been executed. Baker agreed to cooperate and confessed to buying methamphetamine from Carlos in Michigan and then selling it to Taylor, first by the ounce and eventually by the pound. He also explained that Carlos fronted the methamphetamine to him, and he in turn fronted it to Taylor, who was reselling it to members of a motorcycle gang. Baker also said he was paying his son to drive to Michigan to pay Carlos. Agent Tejera allowed Baker to remain free to foster his cooperation, but Baker broke off contact, and a month later the agent arrested the defendant after finding him hiding in a trailer about 10 miles from his home.

Baker did not introduce evidence, but his attorney moved for a judgment of acquittal on the ground that the government's evidence established drug sales from Baker to Taylor but no agreement to engage in further unlawful conduct. The district court denied the motion, and the jury returned a verdict of guilty. At sentencing the court accepted the factual findings and guidelines calculations spelled out in the presentence report, which attributes at least 21 kilograms of methamphetamine to Baker and assigns a total offense level of 45 and criminal-history category of I, yielding a guidelines sentence of life in prison. The district court sentenced him to 360 months plus five years' supervised release.

Baker makes just one argument on appeal: He contends that the evidence is insufficient to sustain his conspiracy conviction because, he insists, the government proved only a buyer–seller relationship between himself and Carlos and between himself and Taylor. Baker calls himself a "middleman" who arranged drug sales from Carlos to Taylor.

A conspiracy is an agreement between two or more persons to commit an unlawful act. *United States v. Villasenor*, 664 F.3d 673, 679 (7th Cir. 2011); *United States v. Johnson*, 592 F.3d 749, 754 (7th Cir. 2010). The government was not required to prove that Baker conspired with anyone specific. *See United States v. Fouse*, 578 F.3d 643, 649 (7th Cir. 2009); *United States v. Avila*, 557 F.3d 809, 816 (7th Cir. 2009); *United States v. Kincannon*, 567 F.3d 893, 898 (7th Cir. 2009). The superseding indictment alleges that Baker conspired with named coconspirators, including Taylor and Baker's son, as well as other persons who were unknown to the Grand Jury. Thus the jury was properly instructed that it need only find that the defendant participated in the "conspiracy as charged with at least one other person, whether or not the other person is named or unnamed."

Baker says nothing about his connection to anyone but Carlos and Taylor. But a rational jury could have found that Baker conspired with his girlfriend, who hid drug proceeds in one of Baker's houses. *See Kincannon*, 567 F.3d at 898–99 (finding sufficient evidence to sustain defendant's conviction for conspiracy to distribute drugs based on relationship with unnamed person whom defendant trusted with details of drug buys and who received discounted drugs). Baker's conviction likewise is supported by the agreement he struck with his son to move drug proceeds from Indianapolis to Carlos in Michigan. James continued accepting money from the defendant for delivering drug proceeds even after deducing that the money was paying for drugs. *See United States v. Garcia*, 580 F.3d 528, 535 (7th Cir. 2008) (rejecting sufficiency challenge where defendant's conviction for conspiracy to distribute methamphetamine rested on evidence that she knowingly transported both drugs and payment for fronted drugs); *United States v. Rodriguez–Ortiz*, 455 F.3d 18, 23 (1st Cir. 2006) (sustaining defendant's conviction for conspiracy to distribute cocaine where evidence showed he acted as bodyguard for drug-ring leader and money runner, transporting thousands of dollars to pay for fronted drugs); *United States v. Lopez*, 443 F.3d 1026, 1031 (8th Cir. 2006) (en banc) (rejecting sufficiency challenge where evidence of defendant's participation in conspiracy to distribute methamphetamine consisted of his single trip from west coast to buyer's residence in South Dakota to retrieve payment for fronted drugs and defendant's presence with seller at drug sale three days after conspiracy had ended).

But even ignoring Baker's connections to his girlfriend and son, the evidence supports his conviction based on his involvement with Carlos and Taylor. We have many times discussed the distinction between a conspiracy to distribute drugs and a wholesale transaction between a buyer and seller. *See, e.g.*, *United States v. Moreland*, 703 F.3d 976, 986–87 (7th Cir. 2012); *United States v. Nunez*, 673 F.3d 661, 666 (7th Cir. 2012); *Villasenor*, 664 F.3d at 680; *United States v. Vallar*, 635 F.3d 271, 287–88 (7th Cir. 2011); *Johnson*, 592 F.3d at 757–58; *United States v. Colon*, 549 F.3d 565, 567–68 (7th Cir. 2008). Although the factors separating the two labels have fluctuated through our cases, we have frequently cited sales on credit as the factor most indicative of a conspiracy. *See Moreland*, 703 F.3d at 987; *Johnson*, 592 F.3d at 755 n.5; *United States v. Baker*, 905 F.3d 1100, 1106 (7th Cir. 1990). And the inference of a conspiracy is bolstered when the credit sales involve large quantities of drugs, become standardized, or occur as part of an ongoing relationship between the buyer and seller. *See Moreland*, 703 F.3d at 986–87; *Villasenor*, 664 F.3d at 680; *Vallar*, 635 F.3d at 287–88; *Johnson*, 592 F.3d at 755 n.5; *Colon*, 549 F.3d at 568.

In this case, the evidence supports Baker's conviction. Baker, for one, refers to himself as a middleman for the sales between Carlos and Taylor; that admission makes him a coconspirator with *both* Carlos and Taylor. *See United States v. Gilmer*, 534 F.3d 696, 701–02 (7th Cir. 2008); *United States v. Garcia*, 45 F.3d 196, 198 (7th Cir. 1995); *United States v. Simone*,

931 F.2d 1186, 1200–01 (7th Cir. 1991). Even without Baker's admission, the evidence from the trial showed that Baker sold methamphetamine to Taylor for about one year, gradually increasing the quantity in the transactions. By the summer of 2011, Baker was selling Taylor 1 to 3 pounds of methamphetamine per week on credit, at a rate of $22,500 per pound, trusting that Taylor would pay him after Taylor resold the drugs to his own customers for $26,000 per pound. The deals followed that consistent pattern and became the standard transaction. And Baker confessed that he knew Taylor was reselling the drugs and that he was present during at least one of Taylor's sales. The evidence that Baker routinely supplied large quantities of methamphetamine to Taylor on credit would allow a rational jury to conclude that the two men were coconspirators. *See Moreland*, 703 F.3d at 987; *Villasenor*, 664 F.3d at 680; *Vallar*, 635 F.3d at 287–88; *Johnson*, 592 F.3d at 755, n.5; *Baker*, 905 F.3d at 1106.

AFFIRMED.