In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 14-2811, 14-3189, 14-3684

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANTHONY LOMAX, DEMOND GLOVER &
BRANDON LOMAX,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
Nos. 12-CR-00189-1,-2,-3 — **Sarah Evans Barker**, *Judge*.

ARGUED NOVEMBER 30, 2015 — DECIDED MARCH 8, 2016

Before ROVNER and WILLIAMS, *Circuit Judges*, and SHAH,
*District Judge*.*

WILLIAMS, *Circuit Judge*. A jury found Anthony Lomax,
Brandon Lomax, and Demond Glover guilty of conspiring to

---

* Of the Northern District of Illinois, sitting by designation.

possess with the intent to distribute and to distribute 1,000 grams or more of heroin. 21 U.S.C. § 841(a)(1). On appeal, the defendants argue that the evidence did not prove beyond a reasonable doubt that they joined the conspiracy with the intent to further the goals of the conspiracy. They maintain they were running three separate heroin businesses. We reject this argument. Anthony Lomax separately argues that he was not a part of the conspiracy, but instead had a buyer-seller relationship with Brandon Lomax. As such, he claims that the district court erred by refusing to instruct the jury about the buyer-seller relationship. We agree and remand Anthony Lomax's case for a new trial to include the buyer-seller jury instruction.

Brandon Lomax argues that he was entitled to a jury determination on whether he had two prior drug convictions, and the district court's finding that he had two prior drug convictions, which enhanced his mandatory minimum sentence to life imprisonment, violated the Constitution. We disagree and affirm his sentence.

Demond Glover also challenges his sentence stating that his case should be remanded for resentencing because he was erroneously classified as a career offender in light of *Johnson v. United States*, 135 S. Ct. 569 (2015). Because we find that the error was harmless, we affirm his sentence.

## I.  BACKGROUND

### A.  Evidence of the Conspiracy

The government suspected Anthony Lomax, Brandon Lomax, and Demond Glover[1] of being part of a conspiracy to distribute heroin. Anthony and Brandon are cousins and Brandon and Demond are cousins. To gather evidence about defendants' operation, the government got court orders to wiretap each defendant's phone. It also used confidential informants to purchase drugs from the defendants, captured the defendants' actions on videotape, and secretly followed the defendants. Over a three-month period, the government intercepted phone calls and text messages among the defendants as well as their communications with their heroin suppliers or customers. Bureau of Alcohol, Tobacco, Firearms and Explosives Task Force Detective Jake Hart reviewed videotapes of and occasionally followed the defendants. The government also captured the defendants' sale of heroin on videotape. Most of the evidence collected focused on events that occurred at Brandon's business, Spray'Em Auto Body. A grand jury indicted Brandon, Anthony, and Demond, charging them with one count of conspiracy to possess with intent to distribute and to distribute 1,000 grams or more of heroin under 21 U.S.C. § 841(a)(1). The indictment charged that the conspiracy lasted from 2009 until October 2012. The grand jury also charged the defendants with additional distribution or possession with intent to distribute counts, which they do not challenge on appeal.

---

[1] To avoid confusion, we will use first names when referring to defendants separately since Anthony and Brandon share the same last name.

At trial, the government showed that Brandon and Demond purchased heroin from two main sources and that all defendants sold heroin. James Kelley testified that Brandon purchased heroin from him. Gary Tate testified that Demond purchased heroin from him. Describing one of the wiretap conversations he listened to, Hart testified that a phone conversation Demond had suggested that Demond bought heroin for himself and Brandon from Tate. There was no evidence that Anthony purchased from Kelley or Tate. Instead, the evidence showed that Anthony purchased heroin from Brandon. He also purchased heroin from Demond at least once, explained in more detail below. There was also evidence of controlled purchases by confidential informants, eight purchases of heroin from Brandon, three purchases of heroin from Demond, and five purchases of heroin from Anthony.

Brandon's supplier Kelley provided evidence that Demond and Brandon were in business together. Kelley testified that on one occasion, Brandon and Kelley drove together to Demond's house so that Brandon could pick up money from heroin sales that he owed to Kelley. Kelley stayed in the car while Brandon collected the money from Demond. They then drove to another location where Brandon collected more money he owed to Kelley. Kelley also testified that Brandon told him that Brandon, Brandon's cousin, and Brandon's brothers were selling one kilogram of heroin per month.

There was additional evidence that Brandon and Demond were business partners. The government showed the jury a text message from Brandon to Demond that said "needed to borrow 50 until he call, got somebody, won't

wait." Hart testified that he interpreted the text to mean that Brandon was telling Demond that he borrowed fifty grams of heroin from Demond's supply until his supplier delivered additional heroin, so he could sell heroin to an impatient customer. Demond did not respond to the text.

There was other evidence of Brandon and Demond discussing supplier issues. After Demond met with his supplier, Tate, he called Brandon. Hart testified that during the call, Demond and Brandon discussed how to settle an outstanding debt with Tate. Demond stated that he told Tate, "we just trying to get that shit out of the way, man, because we ain't trying to keep making no payments and doing all that." Hart interpreted this to mean that Demond was telling Brandon that he had told Tate that they would like to clear their drug debt.

The defendants conducted most of their transactions at Spray'Em and each sold their supply to various customers. Hart testified that Anthony and Demond were often at Spray'Em even though neither of them worked there during the relevant period. He also stated that Demond and Anthony conducted hand-to-hand transactions outside of Spray'Em on multiple occasions, selling heroin to multiple buyers. Hart also witnessed Anthony conducting additional transactions at other locations.

Most of the evidence showed that the defendants had different customers, but there was some evidence of shared customers. Communications between Brandon and Demond suggest they shared some customers. For example, Brandon and Demond discussed a shared customer named "Fat-Fat." There was evidence of a phone conversation where Demond told Brandon that Fat-Fat needed heroin by saying that "Fat-

Fat just wanted his shit." Brandon and Demond also shared Anthony as a buyer. In an intercepted phone call, Anthony referred to Spray'Em as "the mall" and told Brandon he wanted to "buy something … at the mall." In another phone call, Demond instructed Anthony to "pull over to Auntie's," where video surveillance showed Demond and Anthony conducting a hand-to-hand drug transaction. Rodney Johnson, one of Brandon's customers, testified that Anthony tried to convince him to buy his heroin from Anthony instead of Brandon.

There was one piece of evidence that Anthony and Brandon shared one customer. Marcus Perry testified that on at least one occasion, Brandon did not have heroin with him and sent Perry to Spray'Em where he could purchase the heroin from Anthony. There is additional evidence of a joint heroin business that included Anthony. Perry testified that Anthony drove Brandon to heroin deals in Indianapolis and was visibly armed while the transactions occurred. In October 2012, Demond was arrested for heroin possession. Immediately after the arrest, a friend of the defendants called Spray'Em to tell Anthony the police had arrested Demond. He asked where Brandon was and encouraged Anthony to find him. In a follow-up call, the friend told Anthony he thought "the block [was] hot," indicating that the police were near Spray'Em.

### B. Jury Instruction and Motion for Judgment of Acquittal

The district court provided the parties with a set of jury instructions, which included a buyer-seller instruction. Thereafter, the government filed proposed jury instructions requesting that the court add an aiding and abetting instruc-

tion, as well as one regarding transcripts. Before the jury instruction conference, the court replaced the preliminary version with a version that excluded the buyer-seller instruction. The defendants objected to the exclusion of the buyer-seller instruction. The district court explained that it removed the buyer-seller instruction because the facts were not "typical of buyer-seller facts" and for the reasons it outlined in its order denying the motions for judgment of acquittal.

Each defendant filed a motion for judgment of acquittal. The primary argument in Anthony's and Demond's motions was that the government had only proven a buyer-seller relationship, not a conspiracy. The court denied both motions. Brandon also moved for judgment of acquittal. He argued that the evidence was insufficient to sustain a conspiracy conviction. The court also denied his motion.

### C. Verdict and Sentencing

Before trial, the government filed a notice of intention to seek an enhanced sentence under 21 U.S.C. § 851, referencing Brandon's two prior felony convictions, which increased the mandatory minimum from ten years to life imprisonment. After a nine-day jury trial, the jury found all defendants guilty of conspiracy to distribute 1,000 grams or more of heroin. Demond was sentenced to 330 months in prison. Anthony was sentenced to 400 months in prison. Brandon was sentenced to life imprisonment because of his prior convictions. Brandon objected, arguing that the district court's determination that he had two prior drug convictions was a violation of his constitutional rights because it increased the mandatory minimum and he was entitled to a jury determination of any fact that increased the mandatory minimum

sentence. The district court noted Brandon's objection but overruled it. Each defendant filed an appeal challenging the sufficiency of the evidence to sustain the conspiracy conviction. Anthony also challenges the exclusion of the buyer-seller jury instruction. Brandon challenges the constitutionality of his sentence. We consolidated the three appeals.

## II. ANALYSIS

### A. Evidence Sufficient to Sustain Brandon's and Demond's Convictions

Each defendant challenges his conspiracy conviction and argues that the government failed to provide sufficient evidence to prove the existence of a conspiracy between them. The defendants further argue that they were each in business for themselves and that the government failed to prove that they intended to join an agreement in furtherance of a common goal. They do not challenge the drug quantity. Because we are vacating Anthony's conviction and remanding for a new trial on other grounds, we will not discuss Anthony's conspiracy conviction.[2] We review the jury's decision by considering the evidence in the light most favorable to the government. *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010); *see also United States v. Jones*, 713 F.3d 336, 339–40 (7th Cir. 2013). We will overturn a guilty verdict "only when the record contains no evidence, regardless of how it is weighed, from which the jury could" find defendants guilty beyond a reasonable doubt. *United States v. Huddleston*, 593 F.3d 596, 601 (7th Cir. 2010).

---

[2] We note, however, as discussed below in the context of the buyer-seller instruction, that there is evidence from which a jury could find Anthony guilty of conspiracy.

To sustain a conviction for conspiracy to distribute or possess with intent to distribute 1,000 grams or more of heroin, the government must have proven beyond a reasonable doubt: (1) the existence of an agreement by each defendant to distribute or to possess with intent to distribute 1,000 grams or more of heroin; (2) the defendants knew of the agreement; and (3) each defendant intended to work with the other to further their collective aims. *See United States v. Taylor*, 600 F.3d 863, 868 (7th Cir. 2010). Proof of conspiracy may come from direct evidence or circumstantial evidence, *United States v. Hightower*, 96 F.3d 211, 214 (7th Cir. 1996), as well as "the reasonable inferences … concerning the parties' relationships, their overt acts, and their overall conduct," *United States v. Miller*, 405 F.3d 551, 555 (7th Cir. 2005) (quoting *United States v. Navarrete*, 125 F.3d 559, 562 (7th Cir. 1997)).

Here, the evidence is sufficient for a reasonable jury to find that Brandon and Demond agreed to form a heroin distribution enterprise. The government established that a conspiracy existed through its evidence of the communications between Brandon and Demond and the testimony suggesting that they shared customers, a supplier, and heroin, and pooled funds. The intercepted communications showed the jury that Brandon and Demond shared customers Fat-Fat and Anthony. The defendants discussed what Fat-Fat wanted, which showed that Brandon and Demond had agreed to communicate regularly on customer issues and were on the same side of the sale to Fat-Fat. When two individuals sell drugs and are on the same side of a sale to a third party, sufficient evidence of a conspiracy exists. *See United States v. Sachsenmaier*, 491 F.3d 680, 684 (7th Cir. 2007).

Through a combination of wiretaps and testimony, the government also established that Brandon and Demond shared a supplier and pooled funds and heroin. Brandon and Demond discussed their outstanding debt with Tate, a supplier, which suggested to the jury that Brandon and Demond shared a supplier and used shared funds. Brandon's supplier Kelley testified that Brandon took him to Demond's house to retrieve the money owed to him, which suggested that Brandon and Demond pooled funds. Further, the evidence that Brandon sent a text to Demond saying he needed to borrow "50" grams of heroin suggested to the jury that the defendants also pooled their product. Kelley's testimony also suggested that a shared heroin pool existed. He stated that Brandon told Kelley that his cousin and brothers sold one kilogram of heroin per month. The jury could have concluded that the "cousin" was Demond. A reasonable jury could have found that the shared supplier, funds, and product indicated an agreement between Brandon and Demond and that their communications suggested a common goal between them to sell the heroin, which is sufficient to establish a conspiracy. *See United States v. Harris*, 567 F.3d 846, 851 (7th Cir. 2009) (finding that sharing resources and pooling money over a prolonged period is evidence of a conspiracy).

### B. Evidence Merited Buyer-Seller Instruction for Anthony

At the jury instruction conference, Anthony requested that the district court instruct the jury about the difference between a conspiracy and a buyer-seller relationship. He requested the following instruction:

> A conspiracy requires more than just a buyer-seller relationship between the defendant and another person. In

> addition, a buyer and seller of [heroin] do not enter into a conspiracy to distribute [heroin] simply because the buyer resells [heroin] to others, even if the seller knows that the buyer intends to resell the [heroin].

Seventh Circuit Pattern Criminal Jury Instructions § 5.10(A), at 73 (2012 ed.). He argues that he purchased heroin from Brandon to further his own interest of re-selling the drug to his customers for profit, but he was not part of the conspiracy. The district court concluded that the facts that typically support a buyer-seller jury instruction were not present in the case and elected not to give the instruction. It stated that the instruction is warranted when the facts indicate that a buyer is being drawn into the conspiracy by virtue of buying drugs from the seller.

The government argues that the court reviews a district court's decision regarding a jury instruction for abuse of discretion. While we have said that in several criminal cases, *see, e.g.*, *United States v. Chavis*, 429 F.3d 662, 671 (7th Cir. 2005) (reviewing the denial of a buyer-seller jury instruction for abuse of discretion), we have also said that we review the issue de novo, *see, e.g.*, *United States v. Cruse*, 805 F.3d 795, 814 (7th Cir. 2015) (reviewing the denial of a buyer-seller jury instruction de novo). When we review a denied jury instruction, we essentially are reviewing the district court's decision regarding whether a defendant has presented sufficient evidence to become entitled to a jury instruction on a theory of defense. *See United States v. Meyer*, 157 F.3d 1067, 1074 (7th Cir. 1998). This is a question of "[t]he legal sufficiency of a proffered defense[, which] is a question of law and therefore is reviewed de novo." *See United States v. Santiago-Godinez*, 12 F.3d 722, 726 (7th Cir. 1993); *see also United States v. Young*, 613 F.3d 735, 743–44 (8th Cir. 2010) (finding

"the district court's denial of a proffered legal defense" is reviewed de novo and the "district court's *formulation* of jury instructions" is reviewed for abuse of discretion.) So the proper standard of review here is de novo. *See Santiago-Godinez*, 12 F.3d at 726 (finding that the refusal to instruct the jury on an entrapment defense is reviewed de novo, not for abuse of discretion). We will review the issue under that standard. *Cruse*, 805 F.3d at 814.

Anthony was only entitled to the buyer-seller instruction "if: (1) [he] proposed a correct statement of the law; (2) the evidence lends some support to the defendant's theory; (3) [his] theory of defense is not part of the charge; and (4) the failure to include [his] instruction would deny him a fair trial." *Id.* We have repeatedly stated that a district court "should give a buyer-seller instruction where the jury could rationally find, from the evidence presented, that the defendant merely bought or sold drugs but did not engage in a conspiracy." *Id.* (quoting *United States v. Love*, 706 F.3d 832, 838 (7th Cir. 2013)). When the evidence of a conspiracy is strong, we often uphold the district court's refusal to give a buyer-seller instruction. *See Cruse*, 805 F.3d at 814–15 (collecting cases).

The government does not challenge whether the instruction was a correct statement of the law or whether the theory of defense was already part of the charge. It argues that the evidence did not support the theory of defense; instead, "the evidence demonstrated a strong conspiracy among the three, in which [Demond] and Anthony were able to utilize Spray Em auto to distribute their heroin, and in which Brandon and [Demond] freely communicated regarding the status of their sources of heroin." The government also maintains that

the refusal to include the instruction did not deny Anthony a fair trial because no evidence showed that the three defendants had only a buyer-seller relationship. Only Anthony challenges the district court's refusal to give the buyer-seller instruction. If Brandon or Demond made this challenge on appeal, we might agree with the government. However, because there is evidence of merely a buyer-seller relationship between Brandon and Anthony and Demond and Anthony, we disagree.

There is some evidence that Anthony was part of the conspiracy. Like Brandon and Demond, he sold heroin at Spray'Em Auto. Perry, a customer, testified that on one occasion, when he went to buy heroin from Brandon, Brandon sent him to Spray'Em to purchase the heroin from Anthony. Perry also testified that Anthony drove Brandon to Indianapolis to conduct heroin deals, and Anthony was visibly armed.

But, there is also evidence that Anthony was merely Brandon's customer. There is evidence that Anthony bought heroin from mostly Brandon, but also bought heroin at least once from Demond. Anthony would re-sell the heroin to his own customers, not at the direction of Brandon. Also, Johnson, one of Brandon's customers, testified that Anthony tried to get him to buy heroin from Anthony instead of Brandon. This suggests that Anthony did not have a shared common goal with Brandon. Moreover, Kelley, Brandon's supplier, testified that Brandon moved drugs with a cousin and his brothers. If a rational jury assumed Demond was the one cousin mentioned, then it could have excluded Anthony from the conspiracy.

Some of the evidence is equivocal. For example, after Demond's arrest, a mutual friend told Anthony that Demond had been arrested and encouraged Anthony to find Brandon. This could be because the friend knew Anthony and Demond were in business together and wanted Anthony to know his partner was arrested. Alternatively, the jury could have reasonably concluded that the friend told Anthony this information just to get a message to Brandon that Brandon's business partner had been arrested because Anthony could get in touch with Brandon.

Furthermore, there is no evidence of the many characteristics that distinguish a conspiracy from a buyer-seller relationship. Evidence such as "sales on credit, an agreement to look for customers, commission payments, evidence that one party provided advice for the other's business, or an agreement to warn of future threats to each other's business from competitors or law enforcement," *United States v. Villasenor*, 664 F.3d 673, 680 (7th Cir. 2011), is not present. On this record, a rational jury could have rejected the government's theory that Anthony was part of the conspiracy. On this record, we find that there was sufficient evidence to support Anthony's theory of defense and that a reasonable jury could have found that he had only a buyer-seller relationship with the other defendants and was not a co-conspirator.

Because there was sufficient evidence to support the buyer-seller instruction for Anthony, he was denied a fair trial when the judge refused to give the instruction. *See Cruse*, 805 F.3d at 816 (finding that "[i]f the evidence was such that a reasonable jury could have found that the defendant was merely a buyer from the conspiracy, the failure to give a buyer-seller instruction denied [him] a fair trial"

(quoting *Meyer*, 157 F.3d at 1075)). A failure to give the buyer-seller instruction under these circumstances is not harmless error. *Id.* Therefore, Anthony is entitled to a new trial. *See id.*

### C. Brandon's Sentence Did Not Violate Constitution

Brandon argues that his sentence is unconstitutional. Specifically, he maintains that his two prior convictions, which increased his mandatory minimum sentence from ten years to life in prison, had to be proven to the jury and determined beyond a reasonable doubt in light of *United States v. Alleyne*, 133 S. Ct. 2151 (2013). We review this issue de novo. *See United States v. Vallejo*, 373 F.3d 855, 859 (7th Cir. 2004).

Since Brandon was convicted under 21 U.S.C. § 841(a)(1) for distribution of 1,000 grams or more of heroin, the jury's guilty verdict required Brandon to serve at least ten years. 21 U.S.C. § 841(b)(1)(A)(i). Before trial, the government filed a 21 U.S.C § 851 notice regarding Brandon's two prior felony drug convictions, indicating that Brandon's prior convictions subjected him to a mandatory minimum sentence of not ten years, but life if he was convicted of the new drug offense. *See id.* §§ 851, 841(b)(1)(A)(i). After trial, the district court found that Brandon had two prior felony drug convictions and concluded that those convictions increased his mandatory minimum sentence to life imprisonment.

Generally, under the Sixth Amendment, any fact that increases the mandatory minimum sentence is an element of the offense that must be submitted to a jury. *Alleyne*, 133 S. Ct. at 2155. However, a sentencing enhancement based on a prior conviction is not subject to the Sixth Amendment re-

quirement for a jury determination. *Almendarez-Torres v. United States*, 523 U.S. 224, 246–47 (1998). Therefore, the existence of Brandon's prior drug convictions was not a fact the jury was required to find. *See id.* We recognize that there is some tension between *Alleyne* and *Almendarez-Torres*, but that is for the Supreme Court to resolve. We have already determined that we must follow *Almendarez-Torres* and have foreclosed Brandon's argument. *See United States v. Shields*, 789 F.3d 733, 741 (7th Cir. 2015) (finding that "unless the Court acts, we are bound to follow *Almendarez-Torres*," so the fact of a prior conviction that increases a mandatory minimum does not have to be determined by a jury even in light of *Alleyne*). Thus, we affirm Brandon's sentence.

### D. Demond Erroneously Designated a Career Offender, But Error Was Harmless

As a final matter, we note that prior to oral argument, Demond filed a letter pursuant to Federal Rule of Appellate Procedure 28(j) challenging his career offender status. He argues,

> [Demond] had a prior conviction for Indiana's offense of vehicular flight from a law enforcement officer, which was considered a violent felony. Since the decision in *Johnson v. United States*, 135 S. Ct. 2551 (June 2015), it appears that this would no longer apply to [Demond] and his Criminal History Category would change from a VI to a V. It will not effect his Total Offense Level.

> [The district court] found [Demond] to have a Total Offense Level of 42 and a Criminal History Category of VI. His Criminal History Category would decrease to a level V. This would not affect his sentencing range of 360 months to life. [Demond] received a sentence of 330 months which actually falls well below his Total Offense Level. We ask this Court to Remand [Demond] to the

> District Court for a new determination of his guideline
> calculation and sentencing.

The government agrees that the district court erred, but contends that the error was harmless. Since the parties do not dispute the error, we will only address whether the error was harmless. To show that the error was harmless, the government must be able to show that the error had no effect on the sentence the district court imposed. *United States v. Hines-Flagg*, 789 F.3d 751, 757 (7th Cir. 2015).

The district court classified Demond as a career offender under the guidelines. As such, two different offense-level calculations were made. His career offender guidelines calculation resulted in an offense level of 37. His non-career offender guidelines offense level was 42. Because the non-career offender offense level was higher, the district court did not sentence Demond under the career-offender guidelines.

The district court also determined Demond's criminal history category. Because of Demond's career offender classification, his criminal history category was VI instead of V. With an offense level of 42 and a category VI criminal history, his guidelines range was 360 months to life. If the district court had properly determined his criminal history, his guidelines range would also have been 360 months to life.

While announcing Demond's sentence, the district court stated,

> The guidelines that apply to this case don't just happen.
> They are the cumulative total of the assessed harm that
> was caused by your criminal conduct, [Demond], a main
> part of which is, of course, your substantial criminal history, which has accumulated on you here now.

…

> So at the age of 35 when you stand before the Court, it's a different situation, a different challenge than it would be than when you were 25. Although, as has been noted, your criminal history goes back to when you were just really a kid in all the ways in which you found even then, and over the years, to be in trouble with the law.

> So the fact that the guideline range for your sentence is life sort of underscores how serious your criminal conduct has been. The range of 360 months up to life is basically, if not all your life, and of course we all hope for some longevity on your part, but it's a big part of what remains of your life at age 35.

> …

> So in trying to decide on a sufficient sentence, it's not too harsh or too extreme, it does seem to me that there's some leeway in the guideline range of 360 months up to life to take into account that the way in which you will be serving your sentence, because of your disability, will be harder on you because of the way in which healthcare is provided.

> …

> So I will vary from the 360-month low end and impose a sentence of 330 months, which is a variance that I think is warranted under 3553(a) given the history and characteristics of you.

On this record, we find that the error is harmless. The district court did not rely on the career offender guideline when determining Demond's sentence. Additionally, the focus of the district court's analysis was the guidelines range of 360 months to life, which was not affected by the error. It is apparent to us that had the guidelines range been properly calculated, the sentence would have been the same. We do note, however, that had the district court relied on

Demond's career offender status when choosing the appropriate sentence, the error would not have been harmless even though the guideline range would have been the same.

### III.CONCLUSION

For the reasons stated, we AFFIRM Brandon Lomax's conviction and sentence and Demond Glover's conviction and sentence. We VACATE Anthony Lomax's conviction and remand for a new trial.