In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-3726

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ERNEST D. SHIELDS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:11-cr-00440-1 — **Rubén Castillo**, *Chief Judge.*

ARGUED OCTOBER 29, 2014 — DECIDED JUNE 15, 2015

Before RIPPLE, KANNE, and SYKES, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Ernest D. Shields was arrested following a brief police chase and charged with possession of a firearm by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). Prior to trial, Mr. Shields filed, and the district court denied, a motion to suppress the evidence obtained at the time of his arrest as well as a motion to dismiss the indictment on the ground that § 922(g)(1) violated the Constitution of the United States. At a hearing three days

before trial, Mr. Shields requested a continuance to allow him to file two past-due reply briefs and to arrange for two additional witnesses. The court denied these requests. After trial, a jury found Mr. Shields guilty, and the district court imposed the fifteen-year mandatory minimum sentence.

Mr. Shields now appeals, setting forth six claims of error. Because the district court correctly decided each controverted issue, we affirm its judgment.

# I

## BACKGROUND

### A.

At approximately 8:00 p.m. on January 10, 2011, Officers Craig Coglianese and David Bachler of the Chicago Police Department were on patrol in an unmarked police vehicle. The officers observed Mr. Shields's parked SUV partially blocking a crosswalk, in violation of Chicago Municipal Code § 9-64-110(c). The officers stopped their vehicle parallel to Mr. Shields's SUV.

Officer Coglianese exited his vehicle, approached Mr. Shields, who was sitting in the driver's seat of his SUV, and asked for his driver's license. After handing Officer Coglianese his driver's license, Mr. Shields voluntarily exited the SUV and, at the officer's request, walked toward the rear of the vehicle with Officer Coglianese. During this time, Officer Bachler had exited the driver's seat of the police vehicle and had walked around to its front.

When Mr. Shields reached the rear of the vehicle, he did not stop to talk to the police officers, but instead fled east down an adjacent street. Officer Coglianese gave chase to Mr. Shields. When Mr. Shields turned left down an alley, the officer followed and saw Mr. Shields pull a firearm out of his right coat pocket. Shortly thereafter, Officer Coglianese caught up to Mr. Shields and pushed him to the ground. Officer Bachler arrived in the police vehicle after one or two minutes, and the officers placed Mr. Shields in handcuffs. The officers rolled Mr. Shields over and discovered a loaded six-shot .22-caliber revolver on the ground. It was the same firearm that Officer Coglianese had observed Mr. Shields remove from his pocket.

The officers placed Mr. Shields in the back of their police vehicle, and Officer Coglianese read Mr. Shields his *Miranda* rights. Thereafter, Officer Coglianese asked Mr. Shields, "Why are you running with a gun?"[1] Mr. Shields responded, "I shouldn't have had that weapon on me."[2] At the police station, Officer Coglianese gave Mr. Shields a ticket for blocking the crosswalk. Mr. Shields then was taken to the hospital for treatment for a cut over his left eye that he sustained during the arrest.

**B.**

On June 22, 2011, a grand jury indicted Mr. Shields for possession of a firearm by a felon, in violation of 18 U.S.C.

---

[1] R.143 at 163.

[2] *Id.*

§§ 922(g) and 924(e)(1). The indictment thus listed both the substantive crime and sentencing provision under the Armed Career Criminal Act. In due course, Mr. Shields filed a motion to suppress the firearm and his statements following his arrest. In that motion, he maintained that the traffic stop was illegal, that the police had conducted an illegal search, and that his statement to the police was involuntary. At an evidentiary hearing on this motion, Officers Coglianese and Bachler testified about their encounter with Mr. Shields. Corey Flournoy, an acquaintance of Mr. Shields who was parked down the street at the time, also testified.

Following the hearing, the district court denied the motion. The court first determined that the officers acted within the bounds of the Fourth Amendment in conducting the traffic stop because they had probable cause to believe that Mr. Shields had committed a traffic offense by blocking the crosswalk. Rejecting Mr. Shields's contention that the officers illegally searched him after pulling him from his vehicle, the court found that Mr. Shields had presented "absolutely no evidence that" he was pulled out of the car by the officers.[3] The court went on to note that Mr. Shields's flight provided the officers with probable cause to arrest him for knowingly resisting or obstructing the performance of a police officer in violation of 720 ILCS 5/31-1(a).[4] With regard

---

[3] R.60 at 9.

[4] The statute provides:

> A person who knowingly resists or obstructs the per-
> formance by one known to the person to be a peace of-
> (continued...)

to the discovery of the firearm, the court determined that "[t]he uncontroverted evidence from the suppression hearing establishe[d] that the officers found the gun in plain view after Shields was legally arrested following a traffic stop that was reasonable in duration."[5] Finally, the court concluded that Mr. Shields did not establish that his statements following his arrest were involuntary.

Mr. Shields filed a motion for reconsideration or, in the alternative, a request that the court reopen the suppression hearing to allow Mr. Shields to testify. The next day, Mr. Shields filed a motion to dismiss the indictment on the ground that the statute violated the Second Amendment of the Constitution. The Government filed its responses to Mr. Shields's motions on March 8, 2013. Mr. Shields did not file a reply for either motion by the March 15, 2013, deadline.

At a subsequent hearing, Mr. Shields asked for a continuance of the trial so that he could have more time to file his replies. He stated that he needed more time because his counsel was involved in a separate trial that was "pushed

---

(...continued)

> ficer, firefighter, or correctional institution employee of any authorized act within his or her official capacity commits a Class A misdemeanor.

720 ILCS 5/31-1(a).

> Chicago Municipal Code § 9-64-230 provides that violating § 9-64-110(c) "shall be a civil offense punishable by fine, and no criminal penalty, or civil sanction other than that prescribed in this Code, shall be imposed."

[5] R.60 at 9.

into an inconvenient spot" and because he was trying to arrange for two witnesses.[6] The court denied the request, stating that it was too late to ask for more time to file the replies and that it was too close to trial to grant a continuance. The court specifically noted that Mr. Shields had not filed a request for an extension of the reply deadline and that it was only three business days from trial.

Mr. Shields then filed a motion to dismiss the indictment on the ground that federal jurisdiction could not be established beyond a reasonable doubt. He maintained that the Government could not establish the requisite interstate commerce nexus. The district court denied the motion.

The jury trial commenced on March 25, 2013, and lasted three days. On the second day of trial, Mr. Shields stipulated that he had "been at some time before January 10, 2011 convicted of a felony punishable by imprisonment for a term exceeding one year."[7] The Government offered no additional evidence at trial of Mr. Shields's prior convictions.

The district court instructed the jury that "the government must prove…three…elements beyond a reasonable doubt: No. 1, the defendant knowingly possessed a firearm. No. 2, at the time of the charged act, the defendant was a felon. And, No. 3, the firearm had been shipped or transported in interstate or foreign commerce."[8] The jury

---

[6] R.142 at 2.

[7] R.144 at 3.

[8] R.145 at 48.

found Mr. Shields guilty of possession of a firearm by a felon.

## C.

The presentence report ("PSR") calculated that Mr. Shields had a total offense level of 33 and a criminal history category of VI, resulting in a guidelines range of 235 to 293 months' imprisonment. It also noted that Mr. Shields had three prior violent felony convictions and therefore was subject to a mandatory minimum sentence of fifteen years under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e)(1).

At the sentencing hearing, Mr. Shields, appearing pro se,[9] objected to the PSR on several grounds. He first stated that two of his convictions did not qualify for the ACCA enhancement. Second, Mr. Shields argued that his mandatory minimum sentence violated *Alleyne v. United States*, 133 S. Ct. 2151 (2013), because his three prior felony convictions were not submitted to the jury. Finally, Mr. Shields argued that he received a letter that indicated

---

[9] After trial but before his sentencing hearing, Mr. Shields filed a "Notice of Termination," which stated that he "reject[ed], refute[d] and den[ied] [his counsel's] ineffective/incompetent counsel and legal determination." R.108 at 1. Mr. Shields continued by stating that his counsel's "alleged authority is hereby abrogated, quashed and terminated, for cause, due to [his] fraudulent acts and omissions of malfeasance." *Id.* Mr. Shields's counsel subsequently filed a motion to withdraw, which the court granted after holding a hearing. On appeal, Mr. Shields does not challenge the district court's decision to allow him to proceed to sentencing without counsel.

that his civil rights were restored and that, consequently, the underlying offense could not serve as the basis of a sentencing increase.[10] The district court rejected all of Mr. Shields's arguments and sentenced him to the fifteen-year mandatory minimum, followed by a five-year term of supervised release.

Mr. Shields now appeals his conviction and his sentence. He makes six claims.[11] We will address each in turn.

## II

## DISCUSSION

### A. Failure to Prove Prior Convictions

Mr. Shields contends that, in accordance with recent Supreme Court precedent, his three prior convictions had to be proved to the jury. He also maintains that the criminal process against him was flawed from the beginning because the indictment recited not only the substantive crime of felon in possession of a firearm, under 18 U.S.C. § 922(g)(1), but also the statutory sentencing enhancement for three prior felony convictions under 18 U.S.C. § 924(e)(1). In his view, the recitation of this latter provision obligated the Government to prove before the jury not only the

---

[10] A court may not consider a conviction for purposes of the ACCA if the defendant's civil rights have been restored. *See* 18 U.S.C. § 921(a)(20).

[11] Although Mr. Shields styled his brief as raising seven distinct arguments, we address together his contentions that the Government offered insufficient evidence to prove his three prior convictions and that his prior convictions needed to be proved to the jury.

substantive offense of conviction (possession of a firearm by a felon) but also the existence of each conviction. Alternatively, he submits that the Government constructively amended the indictment by proving only the § 922 offense.

We cannot accept the view that § 924(e)(1), on its own, provides a substantive element of the offense that must be submitted to the jury. In *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), the Supreme Court held that prior convictions are sentencing factors that could be determined by the court and that need not be proved to a jury. *See id.* at 246–47. More recently, the Court held that any fact that increases the mandatory minimum sentence is an element of the offense that must be submitted to a jury. *See Alleyne*, 133 S. Ct. at 2155. But, in crafting that rule, the Court explicitly declined to revisit *Almendarez-Torres*. *See id.* at 2160 n.1.

Mr. Shields nevertheless argues that *Almendarez-Torres* now conflicts with the Court's more recent decision in *Alleyne.* Although we have said that "*Almendarez-Torres* is vulnerable to being overruled," we also have noted that only the Supreme Court can overrule its prior decisions. *United States v. Elliott*, 703 F.3d 378, 381 n.2 (7th Cir. 2012) (quoting *United States v. Browning*, 436 F.3d 780, 782 (7th Cir. 2006)). Accordingly, unless the Court acts, we are bound to follow *Almendarez-Torres*. *See United States v. Boswell*, 772 F.3d 469, 478 (7th Cir. 2014); *United States v. Zuniga*, 767 F.3d 712, 718 (7th Cir. 2014). Mr. Shields's prior felony convictions therefore were not substantive elements of his offense and did not need to be proved to the jury in order to support his fifteen-year mandatory minimum sentence.

The fact that the indictment recited § 924(e)(1) does not alter this conclusion. Including a sentencing provision, such as § 924(e)(1), in an indictment does not transform a sentencing factor into a substantive element. "Under Rule 7(c) of the Federal Rules of Criminal Procedure, a miscitation such as the reference to § 924(e) is harmless error and cannot be grounds for dismissing the indictment or reversing the conviction unless the defendant is misled by the erroneous reference and prejudiced thereby." *United States v. Lowe*, 860 F.2d 1370, 1381 (7th Cir. 1988).[12] Mr. Shields does not contend that he was misled or otherwise prejudiced by the reference to the sentencing provision. Indeed, Mr. Shields's pretrial motions indicate that he was fully aware of the substance of the pending charges.[13]

Finally, Mr. Shields submits that, by including the § 924(e)(1) enhancement in the indictment, the Government constructively amended the indictment by only offering evidence to prove one felony. "A constructive amendment of an indictment occurs when the evidence at trial 'goes beyond the parameters of the indictment in that it establishes offenses different from or in addition to those

---

[12] *See also United States v. Quintero*, 872 F.2d 107, 111 (5th Cir. 1989) (rejecting the defendant's argument after noting that the defendant did "not even allege that he was misled or that he did not receive adequate notice of the charges against him" and finding that there was "no evidence in the record that [the defendant] was misled by the surplusage").

[13] *See United States v. Lowe*, 860 F.2d 1370, 1381 (7th Cir. 1988) (noting that it was "apparent from the content of Lowe's numerous pretrial motions that the indictment created no such notice problem for him or his counsel").

charged by the grand jury.'" *United States v. Phillips*, 745 F.3d 829, 832 (7th Cir. 2014) (quoting *United States v. Pigee*, 197 F.3d 879, 886 (7th Cir. 1999)). The alleged amendment must be sufficiently different such that it would be impossible to know whether the grand jury would have indicted for the crime actually proved. *See id*. Here, because the inclusion of the sentencing provision in the indictment did not create a separate offense, there can be no constructive amendment. Simply stated, the Government presented evidence to prove that Mr. Shields committed the offense set forth in the indictment: it proved that he previously was convicted of a felony and that he possessed a firearm that had travelled in interstate commerce.

**B. Motion to Suppress**

Mr. Shields submits that the district court erred in denying his motion to suppress. He contends that, prior to his running away from the police officers, he had not been seized and was not under arrest. Furthermore, he submits that the parking violation is not an offense that would support his arrest in the alley. The Government takes a distinctly different view of the matter. It submits that the officers undertook a legal traffic stop supported by probable cause: Mr. Shields was committing a traffic offense by parking in a crosswalk in violation of the Chicago Municipal Code. In the Government's view, the violation justified a valid *Terry* investigative stop. The Government further maintains that, because Mr. Shields's running away obstructed the performance of their duty, the officers had probable cause to chase and apprehend him. It contends that

the flight also gave them adequate reasonable suspicion to undertake a *Terry* investigative stop.

## 1.

We begin by setting forth the settled principles that must guide our analysis. When we review a district court's denial of a motion to suppress, we review the district court's finding of historical facts for clear error. *See United States v. Tyler*, 512 F.3d 405, 409 (7th Cir. 2008). Legal determinations, such as the existence of a seizure and probable cause, are reviewed de novo. *See id.*

The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const. amend. IV. In analyzing this important constitutional protection, we have recognized that there are three basic categories of police-citizen interactions:

> The first category is an arrest, for which the Fourth Amendment requires that police have probable cause to believe a person has committed or is committing a crime. The second category is an investigatory stop, which is limited to a brief, non-intrusive detention. This is also a Fourth Amendment "seizure," but the officer need only have specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime. The third category involves no restraint on the citizen's liberty, and is characterized by an officer seeking the citizen's voluntary cooperation

> through non-coercive questioning. This is not a seizure within the meaning of the Fourth Amendment.

*United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir. 1990) (citations omitted).

As this formulation makes clear, not every police encounter implicates the Fourth Amendment. A seizure within the meaning of the Fourth Amendment takes place if, in view of all the circumstances surrounding the incident, a reasonable person would not believe that he was free to leave. *See Florida v. Bostick*, 501 U.S. 429, 439 (1991); *accord United States v. Drayton*, 536 U.S. 194, 201 (2002). In determining whether a reasonable person would believe that he was free to leave or whether, instead, the encounter amounts to a seizure, we consider such factors as:

> (1) whether the encounter occurred in a public place; (2) whether the suspect consented to speak with the officers; (3) whether the officers informed the individual that he was not under arrest and was free to leave; (4) whether the individuals were moved to another area; (5) whether there was a threatening presence of several officers and a display of weapons or physical force; (6) whether the officers deprived the defendant of documents she needed to continue on her way; and (7) whether the officers' tone of voice was such that their requests would likely be obeyed.

*United States v. Johnson*, 680 F.3d 966, 975 n.4 (7th Cir. 2012) (quoting *United States v. Barker*, 467 F.3d 625, 629 (7th Cir.

2006)). We also have considered "whether police indicated to the person that she was suspected of a crime or was the specific target of police investigation." *United States v. McCarthur*, 6 F.3d 1270, 1276 (7th Cir. 1993).

The distinction between a consensual encounter, which does not implicate the Fourth Amendment, and an investigative stop, which does implicate the constitutional guarantee because it constitutes a seizure, is often difficult to discern. On one hand, the Supreme Court has recognized that "mere police questioning does not constitute a seizure." *Bostick*, 501 U.S. at 434; *see also United States v. Childs*, 277 F.3d 947, 950 (7th Cir. 2002) (en banc) (noting that police may approach persons and ask questions "provided that the officers do not imply that answers…are obligatory"). Accordingly, "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen." *Childs*, 277 F.3d at 950 (alteration in original) (quoting *Bostick*, 501 U.S. at 434). A mere request for identification does not change a voluntary stop, which is outside the purview of the Fourth Amendment, into an investigatory stop. *See Bostick*, 501 U.S. at 437 ("As we have explained, no seizure occurs when police…ask to examine the individual's identification… ."); *INS v. Delgado*, 466 U.S. 210, 216 (1984) (explaining that a request for identification by itself does not constitute a seizure under the Fourth Amendment). These principles do not change when an individual is seated in an automobile. *See, e.g.*, *United States v. Douglass*, 467 F.3d 621, 624 (7th Cir. 2006) (holding that "the officers' stance on either side of [the defendant's] car [did not] convert the encounter into a

seizure because he still could have declined to answer their questions and driven away").

Our decision in *Tyler* illustrates the distinction between consensual encounters and investigatory stops. In *Tyler*, we concluded that the defendant would not have believed that he was free to leave, even though "the encounter took place on a public street and the officers did not draw their weapons or (at least initially) lay hands on Tyler," because the officers "told him he was violating the law, took his identification from him and retained it while they ran a warrant check, and told him he could not leave until the warrant check was completed." 512 F.3d at 410. We relied on our precedents addressing whether a defendant is seized when he is approached by officers at an airport or train station. In those cases, we had held that a defendant is seized "[w]here the officers told the defendant he was under investigation for carrying drugs or retained possession of his identification, travel documents, and/or luggage." *Id.* We contrasted such a situation from "[w]here the officers only generally identified themselves as narcotics investigators and immediately returned the defendant's identification and travel documents." *Id.* We concluded that "[a] reasonable person would not feel free to walk away after being confronted by two police officers and told he was committing a crime in the officers' presence."[14] *Id.* at 410–11.

---

[14] *Cf. Florida v. Royer*, 460 U.S. 491, 501 (1983) (plurality opinion) (holding that a suspect was seized when narcotics agents told him "that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart").

The Supreme Court has characterized a traffic stop as a form of an investigative stop. *See Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) ("A seizure for a traffic violation justifies a police investigation of that violation. A relatively brief encounter, a routine traffic stop is more analogous to a so-called '*Terry* stop' than to a formal arrest." (alterations omitted) (internal quotation marks omitted)); *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014) ("The Fourth Amendment permits brief investigative stops—such as the traffic stop in this case—when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." (internal quotation marks omitted) (citing *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968))). In contrast to a consensual encounter, "[a] traffic stop for a suspected violation of law is a 'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment." *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014).

**2.**

Our colleague in the district court, viewing the totality of the circumstances, concluded that this encounter was more properly characterized as a seizure. In the district court's view, the officers approached the vehicle, and Mr. Shields, because they believed that he was in the process of committing an offense against the Chicago Municipal Code by parking his vehicle in a cross walk. In the court's view, the officers had undertaken to confront him about a specific violation of the law and, had that process, already initiated by the officers, not been interrupted by Mr. Shields's flight, that specific confrontation would have taken place.

We agree with the district court's determination. As Mr. Shields admitted in his motion to suppress, the officers effectuated "a stop to issue a parking ticket."[15] After recognizing the parking violation, the officers stopped their vehicle, approached Mr. Shields, asked for his license, and asked him to walk to the back of the vehicles. When Mr. Shields fled the scene, the officers still were in possession of his license. In view of all the circumstances surrounding the encounter, a reasonable person in Mr. Shields's position would not believe that he was free to walk away from the officers.

Because the officers believed that Mr. Shields was in the process of committing a parking offense, they had, at a minimum, reasonable suspicion to believe that the law was being violated. To support an investigatory stop, "officers need only 'reasonable suspicion'—that is, 'a particularized and objective basis for suspecting the particular person stopped' of breaking the law." *Heien*, 135 S. Ct. at 536 (quoting *Navarette*, 134 S. Ct. at 1687). "The standard takes into account the totality of the circumstances—the whole picture." *Navarette*, 134 S. Ct. at 1687 (internal quotation marks omitted). Because Mr. Shields does not dispute that he violated the Chicago Municipal Code by parking in the cross walk, the officers clearly had an objective basis to believe that he was violating the law. *See United States v. Choudhry*, 461 F.3d 1097, 1103–04 (9th Cir. 2006) (holding that

---

[15] R.41 at 3; *see also id.* at 4 ("Ernest Shields had complied with all reasonable requests and the reason for the police to approach and detain him had ended.").

a parking violation is sufficient to support an investigatory stop).

Ultimately, the officers had probable cause to arrest Mr. Shields after they seized him following his flight down the alley. An arrest may be supported by probable cause that the arrestee committed any offense, regardless of the crime charged or the crime the officer thought had been committed. *See Devenpeck v. Alford*, 543 U.S. 146, 153–56 (2004); *United States v. Bullock*, 632 F.3d 1004, 1021 n.3 (7th Cir. 2011). Probable cause exists if a reasonable officer would believe "that the suspect has committed, is committing, or is about to commit an offense," based on the "facts and circumstances within the officer's knowledge." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). "Probable cause is a fluid concept based on common-sense interpretations of reasonable police officers as to the totality of the circumstances at the time of arrest." *United States v. Breit*, 429 F.3d 725, 728 (7th Cir. 2005).

The officers were aware of several facts that would allow a reasonable officer to believe that Mr. Shields committed an offense. First, Mr. Shields's decision to run from the officers constituted another violation of law because he was interfering with the performance of their duty to investigate and, if appropriate, hold him accountable for the earlier violation. *See* 720 ILCS 5/31-1(a).[16] Second, once Officer Coglianese saw Mr. Shields remove a firearm from his pocket, he had probable cause to believe that Mr. Shields had violated Illinois's statutory prohibition then in force

---

[16] *See supra* note 4.

against carrying firearms.[17] *See* 720 ILCS 5/24-1(a)(4) (prohibiting, with limited exceptions, the carrying of "any pistol, revolver, stun gun or taser or other firearm"); *cf. United States v. Price*, 328 F.3d 958, 960 (7th Cir. 2003) ("In a situation, like the one here, where officers see a gun upon approaching a person, they certainly have 'reasonable suspicion' to restrain that person without violating *Terry*.").

### 3.

In summary, the officers had at least reasonable suspicion at the time of their initial encounter with Mr. Shields and acquired additional bases for probable cause when Mr. Shields fled and removed the firearm from his pocket. Finally, at the time of their justifiable seizure in the alley, the weapon was in plain sight and clearly subject to seizure incident to the arrest. The district court, therefore, was on solid ground in denying Mr. Shields's motion to suppress.

---

[17] This court's decision, subsequent to Mr. Shields's arrest, that the prohibition on the carrying of firearms in public was unconstitutional, *see Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012), does not alter our probable cause analysis, *see Michigan v. DeFillippo*, 443 U.S. 31, 37–38 (1979) ("A prudent officer, in the course of determining whether respondent had committed an offense under all the circumstances shown by this record, should not have been required to anticipate that a court would later hold the ordinance unconstitutional.").

### C. *Brady* Claim

Mr. Shields contends that the Government withheld evidence, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose a lawsuit filed in 2004 against the City of Chicago and twenty-six police officers, including Officer Coglianese. He submits that the information following an investigation, presumably conducted in response to that lawsuit, might have included exculpatory information and, at a minimum, be suitable for impeachment purposes. Mr. Shields did not raise the alleged *Brady* violation before the district court; we therefore review the claim for plain error. *See United States v. Mota*, 685 F.3d 644, 648 (7th Cir. 2012). Accordingly, "the alleged *Brady* violation must be an obvious error that affected [the defendant's] substantial rights and created 'a substantial risk of convicting an innocent person.'" *Id.* (quoting *United States v. Daniel*, 576 F.3d 772, 774 (7th Cir. 2009)).

To establish a *Brady* violation, a defendant must "show that (1) the [Government] suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material to an issue at trial." *United States v. Villasenor*, 664 F.3d 673, 683 (7th Cir. 2011). Evidence is suppressed when "the prosecution fail[s] to disclose the evidence in time for the defendant to make use of it" and "the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *Ienco v. Angarone*, 429 F.3d 680, 683 (7th Cir. 2005). Although the Government has an affirmative duty to learn of and to disclose any favorable evidence, the defendant bears the burden of establishing a *Brady* violation by offering more than mere speculation or unsupported

assertions that the Government suppressed evidence. *See United States v. Jumah*, 599 F.3d 799, 808–09 (7th Cir. 2010).

Mr. Shields has failed to demonstrate that any evidence was suppressed by the Government. The lawsuit, and its settlement, have been publicly available since 2004. *See Quarles v. City of Chicago*, No. 1:04-cv-03753 (N.D. Ill. filed June 1, 2004). Mr. Shields could have accessed the settlement at any point before the suppression hearing and trial through the exercise of due diligence. *See United States v. Walker*, 746 F.3d 300, 307 (7th Cir. 2014) (noting that the defendant "never even asked the South [Holland] Police Department to provide him with the evidence"); *United States v. White*, 970 F.2d 328, 337 (7th Cir. 1992) (recognizing that, among other considerations in finding no *Brady* violation, the defendants "had access to the bankruptcy file from which Center extracted and photocopied the notes he turned over to the government").

Indeed, the record makes clear that Mr. Shields was able to obtain both the complaint and the settlement before the end of trial. In his motion for a new trial, Mr. Shields noted that "Officer Coglianese was part of a similar story in another case, which became the subject of a civil rights law suit."[18] Even at sentencing, he expressed his dissatisfaction with his trial counsel's decision "not to bring [the prior lawsuit] up in court," noting that "[s]he could have brought that up to the jurors to say, hey, I got a case similar like my

---

[18] R.100 at 6. *Cf. United States v. White*, 970 F.2d 328, 337 (7th Cir. 1992) (noting that the defendants introduced at trial "the very documents they accuse the government of 'suppressing'").

client."[19] Given that the documents were publicly available and that Mr. Shields admittedly had accessed them, we cannot conclude that they were suppressed under *Brady*.

Mr. Shields notes that he does not focus solely on documents that were contained in the public record. He submits that the Government had access to the "underlying materials and evidence of alleged crimes committed by" Officer Coglianese.[20] But a bare assertion that the prosecution suppressed evidence, without more, is not sufficient to prove a *Brady* violation. *See Jumah*, 599 F.3d at 809. Mr. Shields does not point to any specific evidence that was suppressed by the Government. Instead, he theorizes that, following the filing of the claim, the police department initiated an investigation during which it created documents that show that Officer Coglianese did in fact plant evidence on the plaintiff. There is no reason to think that Mr. Shields's speculation is accurate. *See United States v. Andrus*, 775 F.2d 825, 843 (7th Cir. 1985) (denying request for discovery of personnel files for law enforcement witnesses because there was no suggestion that the personnel files actually contained favorable evidence).

Furthermore, if Mr. Shields had some basis for his belief that Officer Coglianese's file contained evidence that could be used for impeachment purposes, "he could have requested that the district court undertake a review *in camera* of the Government's files." *Jumah*, 599 F.3d at 809 (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 58 n.15 (1987)). "Such a

---

[19] R.146 at 28.

[20] Reply Br. 5.

review is the accepted procedure for resolving *legitimate* doubt about the existence of undisclosed material and one that balances the defendant's important need for access to potentially relevant material with the Government's valid interest in protecting confidential files and the integrity of pending investigations." *Id.* at 810 (emphasis added). Here, we have nothing but speculation. Accordingly, we cannot conclude that the Government committed a *Brady* violation.

## D. Motion to Continue

Mr. Shields also contends that the district court erred in denying his motion to continue the trial to allow him to file replies in support of the pending motions and to locate two witnesses. We will reverse the district court's denial of a motion for a continuance only for an abuse of discretion and upon a showing of actual prejudice. *United States v. Price*, 520 F.3d 753, 760 (7th Cir. 2008).

A district court should consider several factors when ruling upon a motion to continue, including

> (1) the amount of time available for preparation; (2) the likelihood of prejudice from denial of the continuance; (3) the defendant's role in shortening the effective preparation time; (4) the degree of complexity of the case; (5) the availability of discovery from the prosecution; (6) the likelihood a continuance would have satisfied the movant's needs; and (7) the inconvenience and burden to the district court and its pending case load.

*United States v. Crowder*, 588 F.3d 929, 936 (7th Cir. 2009) (quoting *United States v. Miller*, 327 F.3d 598, 601 (7th Cir. 2003)). These factors are not exhaustive, and the district court is in the best position to determine their relative weight at the time the continuance is requested. *See id.* "The party requesting the continuance should identify the specific risk of prejudice, because a court may properly deny a motion to continue that is based wholly on 'vague and conclusory' statements." *Id.* (quoting *United States v. Robbins*, 197 F.3d 829, 846 (7th Cir. 1999)).

We cannot conclude that the district court abused its discretion in denying Mr. Shields's motion for a continuance. Mr. Shields requested the continuance three business days before the start of trial. He had waited, moreover, until after the filing deadline had passed before requesting that the court grant him additional time to reply. After noting that Mr. Shields had not filed a motion requesting an extension, the district court reasonably explained that it was "way too late" to request an extension or a continuance.[21] *See Blue v. Hartford Life & Accident Ins. Co.*, 698 F.3d 587, 594 (7th Cir. 2012) (noting that "courts have an interest in keeping litigation moving forward and that maintaining respect for set deadlines is essential to achieving that goal").

Similarly, the district court did not err in determining that Mr. Shields had enough time to prepare for trial. The record indicates that Mr. Shields's counsel filed an appearance approximately three months before trial. The case was not particularly complex, as Mr. Shields concedes,

---

[21] R.142 at 2.

and the trial lasted only three days. Given these circumstances, Mr. Shields had adequate time to prepare. *See United States v. Bush*, 820 F.2d 858, 860–61 (7th Cir. 1987) (holding that the district court did not abuse its discretion in denying a continuance when the defendant had three months to prepare for a simple case, with one defendant, in a trial that lasted three days).

Nor has Mr. Shields made a convincing argument that he has suffered prejudice by the lack of additional time to prepare. Mr. Shields's vague allegations that additional time would have resulted in a more vigorous defense are insufficient to establish the prejudice necessary to overturn the district court's determination. *See Crowder*, 588 F.3d at 937 (holding that the defendant could not "rely on vague and conclusory statements about his abstract need for more time to review the evidence"). Mr. Shields suggested that he was attempting to get two witnesses "in line."[22] He contends that the district court erred by not inquiring into the identity of the additional witnesses. But it appears that, had the district court asked Mr. Shields for the names of the witnesses he sought, he would have been unable to provide them. Indeed, Mr. Shields was unable to identify the witnesses that he was seeking either in his briefs or at oral argument. Instead, he submits that the witnesses *may* have been Flourney, who testified at the suppression hearing, and Kelly Quarles, who filed the above mentioned lawsuit against the City of Chicago. Without a clearer explanation of the witnesses sought and the prejudice that Mr. Shields faced from the inability to obtain their testimony, we cannot conclude that

---

[22] R.142 at 2.

Mr. Shields was prejudiced by the court's denial. *Cf. United States v. Aviles*, 623 F.2d 1192, 1197 (7th Cir. 1980) (noting that "the contention that the appellant did not call additional witnesses for any reason other than his own trial strategy is unsupported by the record"); *United States v. Walker*, 621 F.2d 163, 168 (5th Cir. 1980) ("In moving for a continuance based on the unavailability of witnesses, a movant must show that: 'due diligence has been exercised to obtain the attendance of the witness, that substantial favorable evidence would be tendered by the witness, that the witness is available and willing to testify, and that the denial of the continuance would materially prejudice the defendant.'" (quoting *United States v. Miller*, 513 F.2d 791, 793 (5th Cir. 1975)).

### E. Consideration of Prior Convictions Under the ACCA

Mr. Shields contends that the district court erred in considering two of his prior convictions when sentencing him under the ACCA. Specifically, he submits that the district court should not have considered his prior convictions for aggravated battery and residential burglary because his civil rights had been restored.

Under § 924(e)(1), a defendant convicted of possessing a firearm following three prior violent felony convictions must be sentenced to a mandatory fifteen-year minimum sentence. Convictions for which a defendant's civil rights have been restored are excluded from consideration. *See* 18 U.S.C. § 921(a)(20). The defendant bears the burden of proving that his rights were restored by a preponderance of the evidence. *United States v. Foster*, 652 F.3d 776, 793 (7th Cir. 2011). To meet his burden, a defendant must prove that his rights to

vote, hold public office, and serve on a jury were restored, and the restoration document must not warn about a lingering firearms disability. *See Buchmeier v. United States*, 581 F.3d 561, 564, 566 (7th Cir. 2009) (en banc). We review de novo whether a district court erred in sentencing a defendant under the ACCA, "except to the extent that the alleged error implicates a factual finding, which we review for clear error." *Foster*, 652 F.3d at 792 (internal quotation marks omitted).

At his sentencing hearing, Mr. Shields testified that he received a letter in 2003 stating that his civil rights were restored. We have recognized, however, that a defendant cannot meet his burden by relying on a vague recollection that he received a letter restoring his civil rights. *See id.* at 793. Mr. Shields did not present the letter to the district court, nor has he provided it on appeal. The only other evidence to which Mr. Shields points in order to support his claim that his civil rights were restored is the PSR. The PSR indicates that his aggravated battery and residential burglary sentences were discharged on May 9, 2002.[23] But the discharge of Mr. Shields's convictions does not, on its own, establish that his civil rights were restored. *See Buchmeier*, 581 F.3d at 564–65 (analyzing discharge letter to determine if defendant's civil rights were restored).

---

[23] In his brief, Mr. Shields attempts to place the burden of proving whether a prior conviction qualifies under the ACCA on the Government. Mr. Shields invites our attention to the discharge language in the PSR and concludes that the Government did not prove that the prior convictions were "convictions" for the purposes of sentencing. As we stated above, however, it is the defendant, and not the Government, who must prove that his rights were restored.

Accordingly, Mr. Shields has not carried his burden, and therefore the court did not err in considering his prior convictions for sentencing under the ACCA.

### F. Constitutionality of 18 U.S.C. § 922(g)(1)

Finally, Mr. Shields contends that § 922(g)(1) violates his right to bear arms under the Second Amendment of the United States Constitution. He relies on the Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), as well as our decision in *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012).

The Supreme Court has recognized that the Second Amendment protects an individual's right to keep and bear arms for his personal defense. *See Heller*, 554 U.S. at 635. The Court noted, however, that nothing in its opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *See id.* at 626.[24]

Applying Supreme Court precedent, we have acknowledged that some categorical bans on firearm possession are constitutional. *See United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc). Indeed, in *United States v. Williams*, 616 F.3d 685 (7th Cir. 2010), we addressed the exact question presented here: whether the prohibition of

---

[24] *Accord McDonald v. City of Chicago*, 130 S. Ct. 3020, 3047 (2010) (plurality opinion) ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons… . We repeat those assurances here." (internal quotation marks omitted)).

firearm possession by a convicted felon under § 922(g)(1) is constitutional. We concluded that keeping firearms out of the hands of violent felons is an important objective, and, because the defendant was a violent felon, applying § 922(g)(1) to the defendant was substantially related to that objective. *See id.* at 693.

Because Mr. Shields was convicted of three violent felonies, applying § 922(g)(1) here is substantially related to the Government's important interest in keeping firearms away from violent felons. We thus conclude that § 922(g)(1) is constitutional as applied to Mr. Shields.

### Conclusion

The judgment of the district court is affirmed.

AFFIRMED