In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 15-1366

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RANDY JOHNSON,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 14-CR-25 — **Rudolph T. Randa**, *Judge.*

---

ARGUED NOVEMBER 17, 2015 — DECIDED MAY 17, 2016

---

Before FLAUM, EASTERBROOK, and HAMILTON, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Police in Milwaukee saw a car stopped within 15 feet of a crosswalk, which is unlawful unless the car is "actually engaged in loading or unloading or in receiving or discharging passengers". Wis. Stat. §346.53(5). One police car drew up parallel to the stopped car, and an-

other drew up behind. Shining lights through the car's windows (it was after sunset), police saw a passenger in the back seat try to hide a firearm. Randy Johnson, the passenger, was prosecuted for possessing a weapon that, as a felon, he was forbidden to have. 18 U.S.C. §922(g)(1). After the district court denied his motion to suppress the gun, see 2014 U.S. Dist. LEXIS 135367 (E.D. Wis. Sep. 25, 2014), adopting 2014 U.S. Dist. LEXIS 135374 (E.D. Wis. Aug. 7, 2014), Johnson entered a conditional guilty plea and was sentenced to 46 months' imprisonment. His sole argument on appeal is that the district judge should have granted the motion to suppress.

Johnson concedes that the car was stopped within 15 feet of a crosswalk. The district court held that this gave the police probable cause to issue a ticket, see *Whren v. United States*, 517 U.S. 806 (1996)—and as soon as they approached they saw the gun.

Johnson says that the statutory exception for receiving or discharging cargo or passengers means that the police could not have probable cause until they had observed the car long enough to know that it was not within the scope of the exception. The district judge considered and rejected that possibility. Even a brief glimpse of the car revealed probable cause, because officers need not negate all possible defenses. They can hand out tickets (or make arrests) and leave to the judicial process the question whether a defense applies. See, e.g., *Baker v. McCollan*, 443 U.S. 137, 145–46 (1979); *Hurem v. Tavares*, 793 F.3d 742 (7th Cir. 2015); *Askew v. Chicago*, 440 F.3d 894 (7th Cir. 2006). What's more, the district judge thought, a brief look was long enough to think that the car was just sitting there. The car's doors were closed. No one was getting in or out, walking away, or approaching. When the police got closer they saw

that no one was in the driver's seat, a further problem because the statutory exception has a proviso: a vehicle stopped for loading or unloading must be "attended by a licensed operator so that it may promptly be moved in case of an emergency or to avoid obstruction of traffic." Wis. Stat. §346.53(5).

The district court added that, whether or not the police had probable cause, there was enough evidence to justify a brief stop for the purpose of investigation. See *United States v. Shields*, 789 F.3d 733, 744–46 (7th Cir. 2015), another case arising from a car stopped too close to a crosswalk. The judge assumed that pulling police cruisers alongside and behind the stopped car amounted to a seizure, see *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014), even though it was not blocked in front, but thought it reasonable for the police to investigate whether the stopped car was within the scope of the statutory exception. *Shields* establishes that probable cause to believe that a parking offense is ongoing justifies at least a brief stop. Johnson has not asked us to reexamine *Shields*—and the holding of *Atwater v. Lago Vista*, 532 U.S. 318 (2001), that a fine-only offense may be followed by a custodial arrest, forecloses any argument that police must refrain from making stops to enforce those laws that lead to citations. No driver is free to zoom away while the police are writing a parking ticket.

Police approach stopped cars countless times every day; the number of parking tickets issued (usually to unoccupied cars) is high. Sometimes officers write tickets; sometimes they don't; if the car is occupied, the difference may depend on what the driver says. The Fourth Amendment requires searches and seizures to be reasonable; it does not demand that police resolve all possible defenses and exceptions before asking the first question.

Indeed, because the car was stopped in a public street, police did not need any reason at all to approach and look through the window. See, e.g., *United States v. Dunn*, 480 U.S. 294 (1987); *United States v. Contreras*, No. 15-1279 (7th Cir. Apr. 19, 2016), slip op. 7–10. Officers do not violate the Fourth Amendment by viewing things they can see "from a public vantage point where they have a right to be." *Florida v. Riley*, 488 U.S. 445, 449 (1989). Contrast *Florida v. Jardines*, 133 S. Ct. 1409 (2013) (discussing limits on what can be done in or near a home). It was the fact that the police approached the car that enabled them to see the gun. Everything else followed naturally (and legally).

We grant that the police did more than just stroll up: two squad cars, which bathed the parked car in bright light, implied that the occupants were not free to drive away. But as it happened the number of cars, and the use of lights, did not play a role in the causal sequence. (The cruisers' lights may have played some role by supplementing the streetlamps, but Johnson does not contend that shining light into a car on a public street is unreasonable under the Fourth Amendment. See *Dunn*, 480 U.S. at 305.) No one was in the driver's seat, so the parked car *could not* drive away, no matter what the occupants wanted or thought they were free to do. A lone officer who ambled up amiably and shone a flashlight through the window would have seen everything needed to set up a lawful seizure of the gun. When the contested activity (here, the show of force through the use of two cars and bright lights) does not matter, it is also not a basis for suppressing evidence. When discovery would have occurred anyway, through proper means, the exclusionary rule would be overkill and must not be employed. See, e.g., *Nix v. Williams*, 467 U.S. 431, 444 (1984).

An undertone of Johnson's brief is the suggestion that the police displayed excessive force, whether or not they had reasonable suspicion or even probable cause. Is it reasonable, Johnson wonders, for the police to use two cruisers and powerful lights just to determine whether someone deserves a ticket for a parking violation? (Johnson does not contend that excessive force was *used*, only that the display was over the top.) Was it necessary, he asks, for one officer to open a door and tell all occupants to put their hands where they could be seen?

The police call this a high-crime area, and perhaps the presence of multiple officers and electric lights—which Justice Brandeis called "the most efficient policeman," *Other People's Money* 62 (1933)—prevented the handgun from being used. But we need not try to determine whether the police put on an unnecessary display. This is a criminal prosecution, not a suit seeking damages. We held in *United States v. Jones*, 214 F.3d 836 (7th Cir. 2000), that damages, not the exclusion of evidence, is the appropriate remedy for the use of unreasonable force, when the application of reasonable force would have produced the same evidence anyway.

The Supreme Court reached the same conclusion in *Hudson v. Michigan*, 547 U.S. 586 (2006), when holding that a violation of the knock-and-announce requirement does not justify exclusion, because if the police had knocked and waited a reasonable time, as they should have done, they would have seized the same evidence. The Justices discussed the high social costs of excluding evidence and held that damages are the right remedy for search-and-seizure errors that do not give the police access to evidence that could not have been obtained lawfully. See also, e.g., *United States v. Langford*, 314

F.3d 892 (7th Cir. 2002). The multiple cars, the searchlights, and the visible-hands order all were out of the causal sequence and do not justify suppression, even if each step was unjustified when compared with sending a single officer to saunter up to the parked car.

Likewise damages would be the right remedy for a stop motivated by race, as they are for other violations of the Equal Protection Clause, if the police had probable cause or were otherwise where they had a right to be, and therefore did not violate the Fourth Amendment when seeing a gun. At all events, Johnson does not contend that his race, or that of the other occupants, played any role in this stop.

So although we agree with the district court that, given *Shields*, the police had at least reasonable suspicion to stop the parked car long enough to find out what was going on, we also conclude that the police would have discovered the same evidence without a seizure (because any officer was free to walk up to the parked car, which lacking a driver was not going anywhere), and that exclusion of evidence in a criminal prosecution would be the wrong remedy for the harmless steps of using extra cruisers and excessive lighting.

AFFIRMED

HAMILTON, *Circuit Judge*, dissenting. The police violated the Fourth Amendment rights of defendant Johnson and the four other occupants of the car. What happened here was extraordinary. No other court has tolerated such tactics in such a case. Five officers in two police squad cars seized the passengers of a parked car. They swooped in on the car, parking close beside and behind it, with bright lights shining into it from both directions, opened the doors, pulled all passengers out, and handcuffed them. The passengers were seized before the officers had any sign that one passenger might have a firearm.

The sole basis offered to justify this highly intrusive, even terrifying, "investigatory stop" was a suspected *parking violation!* The phenomenon of police seizures for "driving while black" has long been recognized. See, e.g., David A. Harris, *Driving While Black and all Other Traffic Offenses: The Supreme Court and Pretextual Traffic Stops*, 87 J. Crim. L. & Criminology 544 (1997). In this case, we seem to be taking the further step of enabling police seizures for "parking while black."

Taking this further step is a mistake not required by existing law, and it runs contrary to the core Fourth Amendment standard of reasonableness. There are two alternate grounds for reversal here. The first and broader is that the rule allowing pretextual traffic stops under the combination of *Terry v. Ohio*, 392 U.S. 1 (1968), and *Whren v. United States*, 517 U.S. 806 (1996), should not be extended to mere parking violations where the legal sanction would be only a citation and fine. The second and narrower ground is that even if such an extension is recognized in theory, the police did not have a reasonable basis for this seizure.

On the first, broader question of extending *Terry* and *Whren* to allow seizure of a person to investigate a possible parking violation, the Supreme Court has not gone so far. The core Fourth Amendment standard is reasonableness. That's what drove the balance between privacy and law enforcement in *Terry* itself. 392 U.S. at 20–21. Extending *Terry* and *Whren* to allow police to use a parking violation as a pretext for seizing a car's passengers, and then using the occasion to remove them and handcuff them, loses sight of reasonability and proportionality.

*Terry* of course authorized investigatory stops without a warrant when a police officer has a reasonable suspicion that a person is engaged or is about to engage in crime. The logic of *Terry* has long been understood to authorize traffic stops to address violations of traffic laws. E.g., *Pennsylvania v. Mimms*, 434 U.S. 106 (1977); see also *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (routine traffic stop more analogous to *Terry* stop than to formal arrest). And since *Whren*, American constitutional law has allowed police officers to carry out intrusive traffic stops based on the pretext of investigating a moving traffic violation.

This combination of constitutional decisions already enables aggressive and intrusive police tactics. Officers who have probable cause for a trivial traffic violation can stop the car and then order all occupants out of the car, *Maryland v. Wilson*, 519 U.S. 408 (1997), often to frisk them, *Arizona v. Johnson*, 555 U.S. 323 (2009), to inspect the interior of the car visually, *Colorado v. Bannister*, 449 U.S. 1, 4 n.3 (1980), and often to search at least portions of the vehicle's interior. *Arizona v. Gant*, 556 U.S. 332 (2009); *Michigan v. Long*, 463 U.S. 1032 (1983). Add in the fact that a stop can be justified by an officer's *mistake* of either

law or fact, *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014), and the opportunities for pretextual intrusions on civilians multiply.[1]

So let's set the stage for this case. It's just after 7:30 p.m. on January 8, 2014, in a tough neighborhood in Milwaukee. It's dark, and it's very cold, during the "Polar Vortex." The air temperature is about 8 degrees Fahrenheit, with a wind-chill of about 20 degrees below zero. There is about eight inches of snow on the ground. The streets are quiet.

Five police officers are patrolling together in two squad cars. They are part of the Milwaukee Police Department's Neighborhood Task Force Street Crimes Unit assigned to patrol so-called "hot spots." As one officer testified, "part of our initiative is to look for smaller infractions and hope that possibly they may lead to bigger and better things." Tr. 66. Hence the exploitation of *Whren*.

In search of "bigger and better things," the officers see a car parked on a side street in front of a liquor store. The motor is running. The officer in charge decides this is an opportunity: the car is parked within fifteen feet of a crosswalk. That

---

[1] A violation as minor as a blown light bulb for a license plate can be used to justify such intrusions. E.g., *United States v. Harrison*, 606 F.3d 42, 45 (2d Cir. 2010); *United States v. Smith*, 86 Fed. App'x 966 (7th Cir. 2004). We regularly see cases where a police officer is instructed to conduct a traffic stop on a particular suspect's vehicle, which can be done virtually at will. This is not a new observation. The future Justice Jackson said in 1940: "We know that no local police force can strictly enforce the traffic laws, or it would arrest half the driving population on any given morning." R. Jackson, The Federal Prosecutor, Address Delivered at the Second Annual Conference of United States Attorneys, April 1, 1940, quoted in *Morrison v. Olson*, 487 U.S. 654, 727–28 (1988) (Scalia, J., dissenting).

means the car *might be* parked illegally! (I'll overlook the fact that the crosswalk is both unmarked and snow-covered.)

The officer makes a split-second decision. The police cars quickly turn onto the side street and close in on the parked car—one police car pulls up next to and a little in front of the parked car, and the other pulls up right behind it. From both directions, the police light up the parked car with their headlights, spotlights, and flashlights. The five officers get out of their cars and immediately open the car doors and remove and handcuff the passengers. One, defendant Johnson, is unlawfully in possession of a firearm that he had placed on the floor of the car's interior.

The district court found, and I agree, that the car's passengers were seized the moment the police cars pulled up next to and behind the parked car. From that moment, the passengers could not have felt free to walk away. This was not a reasonable seizure. It cannot be justified as the constitutional equivalent of an officer strolling up to a parked car to see if the driver or passengers are willing to chat. The passengers in the car were seized, and in a sudden and terrifying way.

The government's theory here is that the suspected parking violation justified the seizure of the passengers. The government sees no difference between this and a suspected traffic violation, so that all the police tactics permitted in a pretextual traffic stop under *Whren* can be used when a car might be parked illegally. The Supreme Court has not gone so far, and other relevant case law is sparse.

In *United States v. Thornton*, 197 F.3d 241 (7th Cir. 1999), two officers in a "high crime" neighborhood walked toward a car parked in a no parking zone. They saw the driver get out of

the car with what looked like a police radio scanner. The officers patted down the driver and spotted what looked like a package of a kilogram of cocaine on the floor of the back seat. Citing both *Florida v. Royer*, 460 U.S. 491 (1983), and *Whren*, we affirmed denial of a motion to suppress the evidence found in the car. We reasoned that if the police could simply approach a person on a public street for no reason and could pull over a vehicle for a civil traffic violation, then the officers did not violate the Fourth Amendment by "walking up to Thornton, who was sitting in a car that rested in a spot where it was violating one of Chicago's parking regulations." 197 F.3d at 248.

We went on to note, however, that whether "an illegally parked car, a crime-ridden neighborhood, the driver's sudden exit, and the driver's possession of a device that was monitoring police radio traffic adds up to sufficient suspicion to justify a *Terry* stop is a close call." *Id*. When the police seized the car and its occupants in this case, they had much less to go on than the police had with that "close call" in *Thornton*. And the police tactics here were much more intrusive than the officers' approach in *Thornton*.

The majority and the district court have found support in *United States v. Shields*, 789 F.3d 733, 745 (7th Cir. 2015), where we treated a parking violation as enough to support an investigatory *Terry* stop, though the real action in *Shields* concerned the driver's decision to flee from the officers. We supported that extension of *Terry* to a parking citation by citing *United States v. Choudhry*, 461 F.3d 1097, 1103–04 (9th Cir. 2006) (allowing investigatory stop of vehicle in no-stopping/tow-away zone), which cited in turn *United States v. Copeland*, 321 F.3d 582, 594 (6th Cir. 2003) (allowing stop based on parking violation).

These extensions of *Terry* to suspected parking violations remain few in number and are, I believe, mistaken. An illegally parked car is a far cry from the would-be robbers casing their target in *Terry v. Ohio*. The officers could only have issued a citation here. In *Terry* the Supreme Court struck a practical and necessary balance between protecting privacy and allowing effective law enforcement, see 392 U.S. at 20–21, but it did so in the context of an imminent armed robbery. That balance looks very different where the threat to law and order is a parking violation. The intrusions on privacy and restraints on liberty authorized by *Terry* are not justifiable to write a parking ticket.

There is a second, narrower ground for reversal here. Even if *Terry* and *Whren* might be extended to reach some actual parking violations, such an extension should not justify the seizure of passengers here. The police did not reasonably suspect a parking violation when they pounced here.

The police relied on a Wisconsin statute that provides:

> No person shall stop or leave any vehicle standing in any of the following places except temporarily for the purpose of and while actually engaged in loading or unloading or in receiving or discharging passengers and while the vehicle is attended by a licensed operator so that it may promptly be moved in case of an emergency or to avoid obstruction of traffic:
>
> (1)   In a loading zone.
>
> (2)   In an alley in a business district.

    (3)    Within 10 feet of a fire hydrant, un-less a greater distance is indicated by an official traffic sign.

    (4)    Within 4 feet of the entrance to an alley or a private road or driveway.

    (5)    Closer than 15 feet to the near limits of a cross-walk.

    (6)    Upon any portion of a highway where and at the time when parking is prohibited, limited or restricted by official traffic signs.

Wis. Stat. § 346.53.

The law makes clear that the car and passengers the police seized in this case could stand lawfully exactly where they were if the car was there "temporarily for the purpose of and while actually engaged in loading or unloading or in receiving or discharging passengers and while the vehicle is attended by a licensed operator." That was what the police saw here: the driver had gone into the liquor store, and the motor was running.

Without more, a car stopped in front of a store with its motor running is simply not suspicious. Given the sensible statutory proviso for cars that are loading and unloading, the police here could not decide that this seizure was reasonably justified in the few seconds they took from spotting the car until they swooped in to seize it and its passengers.

Yet the majority treats what the police saw as suspicious enough to justify the seizure. That rationale overlooks the fact that the statute does not require the driver to "occupy" the car

while loading or unloading. It requires only that the car be "attended" by a driver so it can be moved if needed. A lone driver making deliveries and pick-ups will not always be in the vehicle but may "attend" it for these purposes.

To avoid the logic of the provision for loading and unloading, the majority cites cases from quite different contexts where police officers who receive conflicting information may make arrests and "leave to the judicial process the question whether a defense applies." Slip op. at 2, citing *Baker v. McCollan*, 443 U.S. 137, 145–46 (1979) (arrest based on mistaken identity), and other arrest cases, such as *Hurem v. Tavares*, 793 F.3d 742 (7th Cir. 2015) (trespass arrest of apartment tenant who could not produce copy of lease), and *Askew v. Chicago*, 440 F.3d 894 (7th Cir. 2006) (arrest for threat based on eyewitness accounts).

That reasoning bears no practical relationship to what happened on the streets of Milwaukee in this case. No police officer could expect to keep his job if he treated a standing car as worthy of a *Terry* stop, leaving the driver to explain *in court* that he had just stopped to pick up a package or passenger. Imagine that the police tried that approach in Milwaukee's affluent east side. Citizens would be up in arms, and rightly so.

What made this car different? What made the officers decide instantly to swoop in on this one? On this record, the only explanation is the neighborhood, and the correlation with race is obvious. If these outrageous police tactics could ever be justified based on nothing more than a real parking violation, and they should not, they were not justified in this case.

The majority responds that none of this really matters. The theory is that the unreasonable police tactics did not actually

cause the discovery of the firearm in Johnson's possession. The majority speculates that a police officer could have walked up to the parked car and seen the firearm, prompting the more intrusive removal and handcuffing of all passengers and the search of the car's interior, where the firearm was found.

This rationale runs into at least three problems. First, it was not the district court's or the government's rationale. Second, the district court's factual findings do not support it. The district court correctly found that the car's passengers were seized the moment the police cars stopped next to their car and shined their lights in. No passenger at that point could have thought he was free to just walk away. There is no finding that Johnson's "furtive movements" occurred before the unreasonable seizure of the car. We should base our decision on what the police here actually did, not on an imaginative hypothesis.

Third, the majority's version is not even a plausible account of what happened. We must accept for purposes of appeal the district court's decision to credit Officer Conway's testimony about seeing Johnson's furtive movements. But surely there is no doubt that those movements were reactions to the unreasonable seizure by the police: the sudden presence of police and lights surrounding the parked car. The police are not allowed to violate the Fourth Amendment and then seize the evidence they discover as a person reacts to their violation.

Finally, the majority's suggestions that damages for excessive force or for racial discrimination might be better remedies than exclusion of evidence in the criminal prosecution miss

the point of defendant's appeal. Assuming the majority's general premise is correct, Johnson is not claiming that the officers used excessive force in violation of the Fourth Amendment. Nor has he tried to prove racial motivation in the seizure of the car's passengers. His claim, which I think is valid, is that the *seizure* of the car's passengers was unreasonable in violation of the Fourth Amendment. For that claim, the correct remedy is exclusion of the evidence obtained by means of the unconstitutional seizure, which can offer meaningful deterrence of the violation. See generally *Herring v. United States*, 555 U.S. 135, 140–45 (2009). In addition, exclusion serves the purpose of reassuring the people who are potential victims of unlawful police conduct that the courts will not allow law enforcement agencies to profit from their lawless behavior. *Id*. at 151–53 (Ginsburg, J., dissenting).

For all these reasons, we should reverse the denial of Johnson's motion to suppress. *Terry* and *Whren* should not be extended to authorize seizure of a car's passengers for suspected parking violations. And even if those doctrines could be thus extended in some situations, the officers here had no reasonable basis to believe this car was parked illegally. I respectfully dissent.